William A. Delgado (SBN 222666)
  wdelgado@dtolaw.com
Megan O'Neill (SBN 220147)
  moneill@dtolaw.com
DTO LAW
601 S. Figueroa Street, Suite 2130
Los Angeles, CA 90017
Telephone: (213) 335-6999
Facsimile: (213) 335-7802

Richard L. Schwartz (admitted pro hac vice)
  rschwartz@whitakerchalk.com
Whitaker Chalk Swindle & Schwartz PLLC
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102
Telephone: (817) 878-0524
Facsimile: (817) 878-0501

Attorneys for Plaintiff
DIECE-LISA INDUSTRIES, INC.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

| | |
|---|---|
| DIECE-LISA INDUSTRIES, INC., | Case No.: 2:20-CV-09147-AB-JCx |
| Plaintiff, | Hon. Andre Birotte Jr. |
| v. | **PLAINTIFF DIECE-LISA INDUSTRIES, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| DISNEY ENTERPRISES, INC., et al., | |
| Defendants. | Date:    April 23, 2021<br>Time:    10:00 a.m.<br>Place:   Courtroom 7B |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................ 1

II.   STATEMENT OF FACTS ................................................................. 3

      A.    Randi Altschul and DLI. ........................................................ 3

      B.    Defendants and Their *Toy Story 3* Movie ............................. 5

            1.    Toy Story 3's instant success ....................................... 6

            2.    Lotso's Name Changes from Lots-a-Lovin' to Lots-o'-
                  Huggin'. ....................................................................... 6

            3.    A trademark research report revealed the existence of
                  DLI's "LOTS OF HUGS" mark. .................................. 8

      C.    Interactive Group .................................................................. 8

III.  ARGUMENT ................................................................................... 9

      A.    When Properly Applied to a Reverse Confusion Case, the
            *Rogers* Test Does Not Bar DLI's Claims. ............................. 9

      B.    Ninth Circuit Law Entitles DLI to a Jury Trial on the Issue of
            Likelihood of Confusion. ...................................................... 12

            1.    Disney's "Lotso" mark is a commercially strong mark
                  capable of swallowing up DLI's mark. ...................... 13

            2.    The marks are similar in terms of sight, sound, and
                  meaning ...................................................................... 15

            3.    The parties' goods are clearly related. ...................... 15

            4.    There is a disputed fact as to the issue of intent. ...... 16

            5.    Both DLI and Disney license their products to third
                  parties who manufacture products. ........................... 18

            6.    DLI sells huggable plush bears not designer cars. ..... 19

            7.    Evidence of actual confusion ..................................... 19

            8.    DLI has attempted to expand. .................................... 20

      C.    According to the Plain Language of the Lanham Act, Plaintiff
            Can Seek Disgorgement of Profits. ...................................... 20

      D.    Equitable Tolling Saves DLI's Claims Against DEI & DCP. ......... 22

IV.   CONCLUSION ............................................................................... 23

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

187656.4

1

# TABLE OF AUTHORITIES

2

Page

**Cases**

3

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
    237 F.3d 198 (3d Cir. 2000)..................................................................15

4

5

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*,
    174 F.3d 1036 (9th Cir. 1999) ..............................................................18

6

7

*Caiz v. Roberts*,
    382 F. Supp. 3d 942 (C.D. Cal. 2019) ..................................................12

8

9

*Coryn Group II, LLC v. O.C. Seacrets, Inc.*,
    2010 WL 1375301  (D. Md. Mar. 30, 2010) ........................................22

10

11

*Dr. Seuss Enterprises, L.P. v. ComicMix LLC*,
    983 F.3d 443 (9th Cir. 2020) ................................................................10

12

13

*Dreamwerks Prod. Grp. v. SKG Studio*,
    142 F.3d 1127 (9th Cir. 1998) ........................................................passim

14

15

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
    547 F.3d 1095 (9th Cir. 2008) ..............................................................11

16

17

*Gorden v. Drape Creative, Inc.*,
    909 F.3d 257 (9th Cir. 2018) ................................................................12

18

19

*Interstellar Starship Svcs., Ltd. v. Epix, Inc.*,
    184 F.3d 1107 (9th Cir. 1999) ..............................................................13

20

*J.C. Penney Co., Inc. v. Arctic Enters., Inc.*,
    375 F.Supp. 913 (D. Minn. 1974)........................................................19

21

22

*Lindy Pen Co., Inc. v. Bic Pen Corp.*,
    982 F.2d 1400 (9th Cir. 1993) ..............................................................22

23

24

*Marketquest Group, Inc. v. BIC Corp.*,
    862 F.3d 927 (9th Cir. 2017) ..........................................................passim

25

26

*O'Donnell v. Vencor Inc.*,
    466 F.3d 1104 (9th Cir. 2006) ..............................................................22

27

*Playboy Enters., Inc. v. Baccarat Clothing Co., Inc.*,
    692 F.2d 1272 (1982)............................................................................22

28

2

*Rogers v. Grimaldi,*
   875 F.2d 994 (2d Cir. 1989)....................................................................10, 11, 12

*Romag Fasteners, Inc. v. Fossil, Inc.,*
   140 S. Ct. 1492 (2020) ..............................................................................21, 22

*Spin Master, Ltd. v. Zobmondo Ent., LLC,*
   944 F. Supp. 2d 830 (C.D. Cal. 2012) ..............................................................22

*Sunenblick v. Harrell,*
   895 F. Supp. 616 (S.D.N.Y. 1995) ..................................................................14

*Tyrrell v. BNSF Ry. Co.,*
   No. 4:17-CV-04120, 2018 WL 2944529 (D.S.D. June 12, 2018).....................22

*United States DOL v. Preston,*
   873 F.3d 877 (11th Cir. 2017). ........................................................................22

*Vynamic, LLC v. Diebold Nixdorf, Inc.,*
   2019 WL 193660 (E.D. Pa. Jan. 15, 2019) ......................................................22

*Young v. United States,*
   535 U.S. 43 (2002) ...........................................................................................22

**Statutes**
4 McCarthy on Trademarks and Unfair Competition § 23:10, Reverse
   Confusion (5th ed.) ...........................................................................................13

5 McCarthy on Trademarks and Unfair Competition § 30:64 (5th ed.).................22

1125(c)(5)(B)(i) .....................................................................................................21

15 U.S.C. § 1117(a). .......................................................................................20, 21

Fed. R. Civ. P. 30(b)(6) ..........................................................................................5

Lanham Act 1114(2)(D)(iii) ...................................................................................21

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

187656.4

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Make no mistake: if Disney were the senior user of a mark "Lots-o'-Huggin'"" in connection with a pink teddy bear character, it would be arguing the sale of a pink teddy bear marketed under the junior mark "Lots of Hugs" infringed its intellectual property rights.  In fact, Disney would be arguing the *Sleekcraft* factors weigh in its favor.  After all, Disney would argue, how could the two marks *not* be similar in sight, sound or meaning?  How could identical goods—pink teddy bear characters—not be related?  How would the public not be deceived by such a clear knockoff?  Well, the harm to the senior user is not less significant simply because the shoe is on the other foot.

This is a case of trademark reverse confusion.  Long before a villain named "Lots-o'-Huggin' Bear" terrorized the other toys at *Toy Story 3*'s Sunnyside Daycare, Randi Altschul had created, marketed, and used the trademark LOTS OF HUGS in connection with her huggable, teddy bear products.  Altschul is the sole shareholder of plaintiff Diece-Lisa Industries ("DLI"), the current owner of the LOTS OF HUGS mark at issue here.  Now that Disney's Lotso character and character-related products have saturated the toy industry—as is often the case with all things Disney—the value of DLI's mark is significantly diminished, if not outright destroyed.  When the products are put side-by-side, it is easy to see why a potential third-party licensee would not want to license DLI's product (on the left) for fear it was infringing the IP rights associated with Disney's product (on the right):

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

187656.4



Indeed, DLI already has evidence such harm occurred—a third-party licensee, Interactive Group, suggested to DLI it drop its LOTS OF HUGS mark in favor of "HUG A LOT," at least in part to avoid any potential issues with Disney. But that's not how trademark law works. The Lanham Act protects the senior user, not just the one who can command more market share.

As demonstrated herein, there exist issues of fact as to whether Disney's character, Lots o' Huggin' Bear, produced by Disney/Pixar with full knowledge of DLI's Mark, has created a likelihood of reverse confusion in the marketplace. Disney knew of DLI's mark and chose nonetheless to misappropriate it. DLI's contentions merit a jury trial where DLI will show Ms. Altschul is not the greedy, opportunistic plaintiff Disney portends. She is a renowned inventor and veritable pioneer in the toy industry. And while she may now be solely donating her LOTS OF HUGS bears to charitable organizations, it is only because Disney robbed her of the opportunity to license and market her products elsewhere because, as Interactive Group put it, Disney is the "800 pound gorilla" in the room.

For the reasons set forth herein, DLI respectfully requests the Court deny Disney's motion for summary judgment.

2

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

187656.4

## II.    STATEMENT OF FACTS

### A.    Randi Altschul and DLI.

Randice-Lisa Altschul is a long-time, well-recognized entrepreneur/inventor with deep roots in the toy industry.  She is ranked among the top 70 inventors in the World by INSIDE SANTAS WORKSHOP, a book focusing on the inner workings of the toy and game industry.  PSUF ¶ 63.  She has appeared on many television programs and in newspapers and magazines around the world.  PSUF ¶ 64.  Altschul is the sole owner of Plaintiff Diece-Lisa Industries, Inc. ("DLI" or Plaintiff), PSUF ¶ 1, a toy and game company that principally licenses unique and innovative concepts to third parties who, in turn, manufacture and sell licensed products to the ultimate consumer, PSUF ¶ 65.

In 1995, Altschul, through DLI, created the original presentation artwork for a SNUGGLER'S stuffed bear concept incorporating "hugging technology," PSUF ¶ 66, which Ms. Altschul patented in U.S. Patent No. 5,643,037, PSUF ¶ 3.  DLI presented the SNUGGLER's concept to Happiness Express, a toy manufacturer who renamed the SNUGGLER'S stuffed bear, LOTS OF HUGS.  PSUF ¶ 67.  On February 8, 1995, DLI entered into an exclusive license agreement for her hugging technology agreement with Happiness Express.  PSUF ¶ 68.  DLI was paid an advance of $7500 in July 1995.  PSUF ¶ 69.

In 1996, the LOTS OF HUGS stuffed bears were featured on the cover of Bloomingdale's Christmas catalog.  PSUF ¶ 70.  Indeed, Bloomingdales sold twenty-five thousand (25,000) LOTS OF HUGS stuffed bears in a mere two days.  PSUF ¶ 71.  At the same time, national TV broadcasts featured the LOTS OF HUGS.  PSUF ¶ 72.

Unfortunately, by late 1996, Happiness Express declared bankruptcy, a turn of events that resulted in DLI repurchasing all of its intellectual property assets, including the LOTS OF HUGS trademark and the related hugging technology.  PSUF ¶ 7.  Among the assets was a US Trademark application for LOTS OF

3

1   HUGS for "dolls" that subsequently matured into US Trademark Registration No.

2   2,120,326.  PSUF ¶ 8.

3         Thereafter, in December 1996, DLI entered into a representation agreement

4   with Surge West, Inc.  PSUF ¶ 73.  In May of 1999, the representation agreement

5   resulted in a License Agreement, with DLI as owner, Surge West as Licensor, and

6   Applause Inc. as Licensee for DLI's LOTS OF HUGS properties.  PSUF ¶ 74. The

7   agreement resulted in a license of the hugging technology to Applause, which was

8   then used in association with Jim Hensen's *Bear in the Big Blue House*.  PSUF ¶

9   75.  At the time, Jim Henson was associated with Disney.  PSUF ¶ 76.  Sales of the

10  hugging technology bear product by Jim Henson/Disney/Applause extended from

11  1999 till late 2000-early 2001.  PSUF ¶ 77.

12        DLI continued to secure licensees for its LOTS OF HUGS stuffed bears and

13  related hugging technology.  As of December 23, 1999, DLI entered into a license

14  agreement with Kid Kraze regarding LOTS OF HUGS.  PSUF ¶ 78.  In addition,

15  DLI's marketing attempts with respect to LOTS OF HUGS included

16  communications with 1-800 Flowers in June 2000, PSUF ¶ 79, Pitrone &

17  Associates on July 2000, PSUF ¶ 80, and the Wheelchair Foundation in July 2005,

18  PSUF ¶ 81.  In October 2005, DLI and Marc Summers Productions entered into a

19  worldwide exclusive license with 4Kids Entertainment for a LOTS OF HUGS

20  motion picture and television rights, PSUF ¶ 82, which later fell apart because of a

21  management change before being cancelled in April 2006, PSUF ¶ 83.  By

22  December 2006, DLI developed a business plan to raise a $3 to $5 million

23  investment for direct TV sales of DLI's LOTS OF HUGS.  PSUF ¶ 84.  Rubenstein

24  Communications, one of the biggest PR firms in New York, exhibited interest in

25  this concept, resulting in a September 2007 proposal for DLI's LOTS OF HUGS

26  properties.  PSUF ¶ 85.

27        In May 2007, DLI commenced negotiating with Concord Industries, Inc. to

28  sell LOTS OF HUGS bears as Olympic mascots.  PSUF ¶ 86.  By August 2007,

Concord agreed to a non-exclusive license to sell DLI's LOTS OF HUGS and related hugging technology in the shape of the Olympic LOTS OF HUGS Panda bear. PSUF ¶ 87. The Olympic LOTS OF HUGS Panda Bear was nationally televised on QVC in August 2007 and August 2008 and elsewhere in August 2007 and in August 2008. PSUF ¶ 88. During this time, the Olympic LOTS OF HUGS Panda bears were sold at NBC's Rockefeller Center store. PSUF ¶ 89. Because of this national exposure, the Olympic LOTS OF HUGS Panda bear became a part of DLI's presentation package for potential licensees. PSUF ¶ 90.

In 2007, DLI launched its LOTS OF HUGS website, which resulted in DLI being contacted to order LOTS OF HUGS product, as "the whole point of this was for licensing, developing properties … not for individual sales." PSUF ¶ 91. Among other things, the website promoted DLI's prior successes, such as "Featured at Bloomingdales," Buddy Bear from Snuggler's Playhouse (which became LOTS OF HUGS Around the World), Concord's Olympic LOTS OF HUGS Panda Bear, and Disney's Bear in the Big Blue House from Applause, as shown on the last page of the website, www.lotsofhugs.org. PSUF ¶ 92. This website continues to this date. PSUF ¶ 93.

On January 1, 2008, DLI's application to register LOTS OF HUGS matured into U.S. Trademark Registration Number 3,361,849. PSUF ¶ 8. Throughout 2008, DLI maintained its vigilant efforts to market its LOTS OF HUGS bears and hugging technology, with June 2008 communications to UNICEF France, PSUF ¶ 94, August 2008 communications with Tulip Media, PSUF ¶ 95, and a possible 1-800-Flowers LOTS OF HUGS television show, PSUF ¶ 96. In fact, in 2008, DLI prepared renderings for its LOTS OF HUGS Around the World proposed TV show. PSUF ¶ 97.

## B.  Defendants and Their *Toy Story 3* Movie

At a Rule 30(b)(6) deposition, corporate representative and in-house lawyer, Beth Wilson, confirmed as follows: (i) Walt Disney Company ("WDC") is now the

5

1   Disney parent company; (ii) DEI is a subsidiary of WDC; (iii) Pixar is a wholly-

2   owned subsidiary of DEI.[1]  PSUF ¶ 98.  DEI is the source of all rights acquired

3   from Pixar; DEI licenses DCP and DCP licenses others.  PSUF ¶ 99.  Neither DEI

4   nor DCP market products directly, as DCP licenses others to do so.  PSUF ¶ 100.

5           1.      Toy Story 3*'s instant success.*

6   *Toy Story 3* was developed by Pixar and premiered in theatres in June 2010.

7   PSUF ¶ 101.  It sold 52 million tickets in the United States, grossing over $1

8   billion in worldwide ticket sales—the highest grossing film of 2010.  PSUF ¶ 103.

9   Merchandise related to *Toy Story 3* has led to almost $10 billion in sales.  PSUF ¶

10  104.  *Toy Story 3* won two Academy Awards (Best Animated Feature and Best

11  Original Song) and was nominated for three others (Best Picture, Best Adapted

12  Screenplay, and Best Sound Editing).  PSUF ¶ 105.  It has won many other awards,

13  including at the 2010 Teens Choice Awards (Choice Movie: Animated Film),

14  Hollywood Movie Awards 2011 (Hollywood Animation Award), Digital Spy

15  Movie Awards (Best Movie), 37th People's Choice Awards (Favorite Family

16  Movie), 2010 Satellite Awards (Motion Picture), 2011 Grammy Awards (Best

17  Score Soundtrack), 2010 Heartland Film Festival (Truly Moving Picture Award),

18  82nd National Board of Review Awards (Best Animated Film, Top Ten Films), 9th

19  Washington Area Film Critics Association (Best Animated Feature), 16th Annual

20  BFCA Critics Choice Award (Best Animated Feature), 2010 Golden Tomato

21  Awards (Best Rating Feature, Best Reviewed Animated Film), 68th Golden Globe

22  Awards (Best Animated Feature Film), 64th BAFTA Awards (Best Animated

23  Film), and 37th Saturn Awards (Best Animated Film).  *Id.*

24          2.      *Lotso's Name Changes from Lots-a-Lovin' to Lots-o'-Huggin'.*

25  Originally, the primary antagonist *in Toy Story 3*, Lots-o'-Huggin' Bear

26  a/k/a Lotso was a pink bear named LOTS-A-LOVIN ████████████████

27

28  ───────────────
[1]  Disney purchased Pixar in January 2006.  PSUF ¶ 102.

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

187656.4

1 ██████████████████████. PSUF ¶ 106. ████████████████████████████

2 ████████████████████████████████████████████████



Love-a-Lot Bear clipart

PSUF ¶ 107.

Robert Pauley, the sole Production Designer for *Toy Story 3*, hired Daniel Arriaga as a character designer at Pixar for *Toy Story 3* starting in 2007.[2] PSUF ¶ 108. Pauley shared early drawings with Arriaga, but Pauley had seen the Love-a-Lot Care Bear and did not want Lotso to look like a Care Bear. PSUF ¶ 110.

Contrary to what Disney would have this Court believe, the villain's *full* name was very important. At the June 7, 2006 *Toy Story 3* handoff session, Andrew Stanton stated ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ PSUF ¶ 111. In the movie itself, the bear character first introduces himself "I'm Lots-o'-Huggin' Bear! But, please, call me Lotso!" PSUF ¶ 112.

---

[2]   A character designer creates a visual development of multiple designs to create a new or unique character. PSUF ¶ 109.

7

187656.4

3.    *A trademark research report revealed the existence of DLI's "LOTS OF HUGS" mark.*

In-house counsel for Pixar reviewed the Lots-o'-Huggin' name for clearance from March/April 2007 through Nov 2007.  PSUF ¶ 113.  By October 2007, there was clearance to use Lots-o'-Huggin' in association with the teddy bear character in *Toy Story 3*.  PSUF ¶ 114.  Put differently, as a result of the clearance process, Pixar was already aware of DLI and its mark as of October 2007.  PSUF ¶ 115.

During the clearance process, a trademark search report first goes to Pixar's in-house attorneys and then to Disney's attorneys.  PSUF ¶ 116.  Technically employed by the corporate entity Walt Disney Company, Disney's in-house counsel are a shared resource among its various subsidiaries and are considered "attorneys that work for DEI."  PSUF ¶ 117.  Disney's privilege log reveals that memorandum and opinions resulting from the trademark search were shared with various persons at DEI,[3] Pixar, DCP, and Walt Disney Pictures.  PSUF ¶ 118.  Disney has not produced any of these privileged documents and is not relying on an advice of counsel defense to willfulness.  *Id.*

C.    **Interactive Group**

In July 2011, DLI, through its marketing arm Diecland Entertainment LLC, entered into a License Agreement with Interactive Group (IG) regarding DLI's LOTS OF HUGS trademark and related hugging technology.  PSUF ¶ 119.  DLI gave LOTS OF HUGS bears to the principals of IG, Alan and Ivy Sutton, so they could convince potential buyers (i.e., manufacturers) to manufacture and sell the LOTS OF HUGS bear.  PSUF ¶ 120.  In the first quarter of 2012, Mr. and Mrs. Sutton first alerted DLI to Disney's LOTS-O'-HUGGIN' bear as appearing in Disney's *Toy Story 3* animated motion picture.  PSUF ¶ 121.

---

[3]    At the time, DEI was known as Walt Disney Company; hence the references to that company.  WDC became DEI and, now, WDC is the name of the corporate parent.

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

187656.4

1    Specifically, Alan Sutton claimed there was a potential for marketplace

2    confusion between DLI's LOTS OF HUGS bear and Disney's LOTS-O'-

3    HUGGIN' bear and that Interactive Group did not want a problem with Disney.

4    Sutton made clear Interactive Group did not want a fight with the "800 pound

5    gorilla" [Disney] over these marks as associated with their respective bears.  PSUF

6    ¶ 122.  IG said that LOTS OF HUGS and Lots-O'-Huggin were going to be

7    confused at retail and that it was going to be "a legal mess."  PSUF ¶ 123.  As a

8    result, Interactive Group mandated DLI change its mark from LOTS OF HUGS to

9    HUGALOTS because of the confusion with Disney.  PSUF ¶ 124.  DLI considered

10    this to be the most serious type of confusion, as this was confusion evidence from a

11    licensee—who was the most important as "they were making the product."  PSUF

12    ¶ 125.  In December of 2013 DLI terminated its license agreement with Interactive

13    Group.  PSUF ¶ 126.

14  **III.**    **ARGUMENT**

15    **A.    When Properly Applied to a Reverse Confusion Case, the *Rogers***

16         **Test Does Not Bar DLI's Claims.**

17    It is altogether unclear whether Disney actually acknowledges DLI's theory

18    of trademark infringement is one of *reverse* confusion.  For example, and as

19    discussed below, Disney's likelihood of confusion analysis is bereft of any

20    guidance from the seminal Ninth Circuit cases on reverse confusion and fails to

21    account for the modification to the *Sleekcraft* test in a reverse confusion case.

22    One such modification is also important to the *Rogers* test and explains why

23    *Rogers* cannot be applied reflexively in reverse confusion cases:

24         Our assessment of the *Sleekcraft* intent factor…is
          different when we consider a forward confusion theory
25         than it is when we consider a reverse confusion theory,
          because the relevance of intent varies with the underlying
26         theory of confusion.

27

28

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

187656.4

> When considering forward confusion, we ask 'whether defendant in adopting its mark intended to capitalize on plaintiff's good will.' **However, in the case of reverse confusion, typically 'neither junior nor senior user wishes to siphon off the other's goodwill.'"**

*Marketquest Group, Inc. v. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017) (emphasis added) (citing *Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998)).  In other words, the Ninth Circuit has acknowledged that, because the junior user in a reverse confusion case is ***not*** seeking to palm off the goodwill of the senior user, an analysis of "intent" in reverse confusion cases ***must*** be different than in forward confusion cases.

For the same reason, this Court must carefully consider how the *Rogers* test applies to reverse confusion cases.  As Disney notes, under the *Rogers* test, once a defendant makes a threshold showing the infringement was part of an expressive work, the burden shifts to the plaintiff to show the use of the infringing mark "has no artistic relevance to the underlying work whatsoever," or if it does have some artistic relevance, that it "explicitly misleads as to the source or the content of the work."  *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989).  It is also true the Ninth Circuit has stated, in certain cases, that "explicitly misleading" is "a high bar that requires the use be an explicit indication, overt claim, or explicit misstatement about the source of the work."  *Dr. Seuss Enterprises, L.P. v. ComicMix LLC,* 983 F.3d 443, 462 (9th Cir. 2020).  But that is precisely why the *Rogers* test, like the *Sleekcraft* test, cannot be applied "as is" in reverse confusion cases.

As the Ninth Circuit has recognized, the junior user in a reverse confusion case is *not* trying to siphon off the goodwill of the senior user; as a result, it would be highly unlikely the junior user would make an "explicit" misstatement about the source of the work.  Put differently, if applied without any modification, the junior user in a reverse confusion case nearly always prevails under the traditional

10

187656.4

*Rogers* analysis.  Courts have adopted the *Rogers* test in an effort to strike an appropriate balance between "the public interest in avoiding consumer confusion" and the "public interest in free expression."  *Rogers*, 875 F.2d at 999.  But the reflexive application of *Rogers* in a reverse confusion case such as this one transmogrifies a "balancing test" into the ultimate "gotcha" and creates an exception to trademark infringement that swallows the rule.

As a result, *Rogers* requires a modification in the same vein as *Sleekcraft*. How best to accomplish this?  By considering the purpose of the "explicitly misleading" prong, which was crafted to apply in *forward* confusion cases.  *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1100 (9th Cir. 2008) ("This prong of the test points directly at the purpose of trademark law, namely to avoid confusion in the marketplace by allowing a trademark owner to prevent others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner" and "The relevant question, therefore, is whether the [allegedly infringing product] would confuse its players into thinking that the [senior user] is somehow behind the [junior user's mark] or that it sponsors [the junior user's] product.").  This, of course, is a description of the harm caused by *forward* confusion.  *See Dreamwerks*, 142 F.3d at 1130 ("In an infringement case involving 'forward' confusion, a more well-known senior mark suggests greater likelihood of confusion because a junior user's mark is more likely to be associated with a famous mark.").  As a result, consideration of what constitutes "explicitly misleading" in a reverse confusion case is appropriate.

Notably, DLI's request is not an invitation to stray from precedent.  Rather, DLI simply requests this Court heed the guidance of the Ninth Circuit, which counsels against an application of the *Rogers* test that makes no sense:

> Indeed, the potential for explicitly misleading usage is
> especially strong when the senior user and the junior user
> both use the mark in similar artistic expressions.  Were
> we to reflexively apply *Rogers's* second prong in this

11

187656.4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> circumstance, an artist who uses a trademark to identify the source of his or her product would be at a significant disadvantage in warding off infringement by another artist, merely because the product being created by the other artist is also "art." That would turn trademark law on its head.

*Gorden v. Drape Creative, Inc.*, 909 F.3d 257, 270 (9th Cir. 2018).[4]

Therefore, to strike the appropriate balance between the Lanham Act and the First Amendment in reverse confusion cases, the Court should make a modification to the *Rogers* test similar to the modification made in *Sleekcraft* discussed below with respect to "strength of mark"[5]: **flip the analysis**. Rather than putting the burden on a plaintiff to show that the defendant's use of the mark was an "explicitly misleading" attempt to associate itself with the senior user, a plaintiff in a reverse confusion case should only be required to show that the defendant failed to "explicitly disclaim" an association with the senior user. Here, there is no evidence Disney explicitly disclaimed any association with DLI and, therefore, the *Rogers* test, as appropriately considered in a reverse confusion case, does not stand as an impediment to DLI's claims.

## B.  Ninth Circuit Law Entitles DLI to a Jury Trial on the Issue of Likelihood of Confusion.

Disney is correct when it says the *Sleekcraft* factors are considered in determining whether a likelihood of confusion exists, but it is wrong to invite the

---

[4]  It is true one court in this district reflexively applied *Rogers* in a reverse confusion case. *Caiz v. Roberts*, 382 F. Supp. 3d 942 (C.D. Cal. 2019). But the *Caiz* court did not consider *Dreamwerks* or *Marquest* nor did it consider whether the "explicitly misleading" prong could ever be satisfied in a reverse confusion case.

[5]  As discussed below, in forward confusion cases, courts analyze the strength of the senior mark. In reverse confusion cases, courts analyze the commercial strength of the junior mark.

12

187656.4

court to engage in a bean-counting exercise the Ninth Circuit explicitly prohibits. *Dreamwerks*, 142 F.3d at 1129 ("The factors should not be rigidly weighed; we do not count beans. 'Rather, the factors are intended to guide the court in assessing the basic question of likelihood of confusion.'"). In fact, in *Dreamwerks*, the seminal Ninth Circuit case on reverse trademark infringement, the court reversed a grant of summary judgment for the defendant after examining just three factors, noting "[t]he other five *Sleekcraft* factors don't provide much insight in this case and thus carry little weight." *Id.* at 1130, n. 6; *see also Marketquest Group, Inc. v. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017) ("The *Sleekcraft* analysis is pliant, illustrative rather than exhaustive, and best understood as simply providing helpful guideposts. [T]he relative importance of each individual factor will be case-specific.") (citations and quotation marks omitted). Compounding its initial error, Disney fails to modify the *Sleekcraft* test in this reverse confusion case, as both *Dreamwerks* and *Marketquest* require. Ultimately, the Court should heed the Ninth Circuit's guidance and deny summary judgment. *Interstellar Starship Svcs., Ltd. v. Epix, Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999) ("Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena.").

>    1.    *Disney's "Lotso" mark is a commercially strong mark capable of swallowing up DLI's mark.*

Disney starts its *Sleekcraft* analysis by arguing DLI's mark is conceptually weak. While plaintiff disputes that, it ultimately does not matter. "In a reverse confusion case, [] we must focus on the strength of the *junior* user's mark. . . . [T]he greater the power of [the junior user's] mark in the marketplace, the more likely it is to capture the minds of [senior user's] customers." *Dreamwerks*, 142 F.3d at 1130, n. 5 (emphasis added); *see also* 4 McCarthy on Trademarks and Unfair Competition § 23:10, Reverse Confusion (5th ed.) ("Since in a reverse confusion case, the junior user is not trying to take a free ride on the recognition

13

value of a strong, senior mark, there is no reason to apply the standard requirement that the senior user have a mark strong enough that confusion will result. Rather, the court should evaluate the strength of the junior user's mark so as to gauge its ability to overpower the senior user's mark.); *Sunenblick v. Harrell,* 895 F. Supp. 616, 627 (S.D.N.Y. 1995) ("It is the essence of reverse confusion that the senior user's mark will be comparatively weaker—and quite probably much weaker indeed—than that of the powerful junior user. It is in such cases, where the visibility and strength of the junior user's mark have occupied the field, that the consumer is likely to consider the senior user's product as either emanating from the junior user or infringing upon the junior user's trademark rights. Consequently, the court should properly examine the strength of the junior user's mark"), *aff'd,* 101 F.3d 684, 1996 WL 280477 (2d Cir. 1996).

Disney offers *no analysis* of the commercial strength of its own infringing mark—failing the requirements of Rule 56 out of the gate. But even though Disney provided no precise accounting, its own motion highlights the *incredible* commercial strength of *Toy Story 3* and its various characters: (i) *Toy Story 3* won two Oscars, PSUF ¶ 105; it became the highest-grossing animated motion picture as of 2010, PSUF ¶ 103; it spawned video games, books, plush products, plastic figurines, and consumer products, PSUF ¶ 36. Disney even designed a topiary garden in Epcot Center in the shape of Lotso. On the other hand, Disney's arguments as to DLI—that Ms. Altschul sold her product at a flea market, that Plaintiff sold a mere 2,216 bears[6] over the course of 16 years, that its sales totaled less than $90,000, and that Plaintiffs' royalties from Concord Industries totaled a mere $18,000—prove the commercial power of the senior mark could easily be overshadowed by the Disney machine. PSUF ¶¶ 16, 18.

---

[6]    The number of direct-to-consumer sales is not surprising as DLI is a licensor not a manufacturer or direct-to-consumer retailer.

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
187656.4

Though it was plainly not its intent do so, Disney's motion conclusively establishes this factor weighs in DLI's favor.  *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir. 2000) ("[I]n a reverse confusion claim, a plaintiff with a commercially weak mark is more likely to prevail than a plaintiff with a stronger mark, and this is particularly true when the plaintiff's weaker mark is pitted against a defendant with a far stronger mark.").

> 2.    *The marks are similar in terms of sight, sound, and meaning.*

Just as in *Dreamwerks*, "[s]ight, sound, and meaning is easy." *Dreamwerks*, 142 F.3d at 1131.  DLI owns the mark LOTS OF HUGS for "toys."  Disney's infringing character, a discarded toy, is named "Lots-o-Huggin' Bear'."[7]  Both marks look similar, comprised of the same three components: "lots," the preposition "of" or its more informal form "o'," and some aspect of the word "hug."  For the same reasons, the marks sound similar.  And, perhaps unsurprisingly, they are intended to connote the same meaning: a toy (in this case, a teddy bear) associated with hugs.  PSUF ¶ 127.  Indeed, just as an image of Mickey Mouse is associated with the words "Mickey Mouse"—even when the words are not in the image—an image of Lots o' Huggin' Bear can conjure up the word mark even when the word mark is not used in the image.  PSUF ¶ 128.  Clearly, this factor weighs in favor of infringement.

> 3.    *The parties' goods are clearly related.*

"The clincher is the relatedness of the goods." *Dreamwerks*, 142 F.3d at 1131.  Both "Lots-o'-Huggin'" and LOTS OF HUGS® relate to toy products, including plush stuffed bears.  While Disney argues Plaintiff's toy bears are not related to movies, this is disingenuous.  The infringing character in *Toy Story 3 is* a

---

[7]    Disney inappropriately limits the comparison to "Lotso."  However, it is clear that "Lotso" is an abbreviation or "nickname."  The character's full name is Lots-O'-Huggin' Bear.  In fact, in *Toy Story 3*, the bear *says* "I'm 'Lots-o'-Huggin' Bear! . . . .but, please, **call me** Lotso."  PSUF ¶ 112.

15

187656.4

teddy bear, and it is a well-known fact that Disney movies serve as commercial advertisements for a plethora of later-released movie-related merchandise, including, in this case, stuffed toy bears bearing the name "Lots-o-Huggin.'"[8] PSUF ¶ 129.

### 4.    There is a disputed fact as to the issue of intent.

"[A]n intent to confuse consumers is not required for a finding of trademark infringement." *Marketquest,* 862 F.3d at 934 (citation omitted).  Nonetheless, there *is* evidence of "intent" here under the principles espoused in *Marketquest* for reverse confusion cases:

> Intent could also be shown by evidence that, for example, *the defendant knew of the mark, should have known of the mark, intended to copy the plaintiff, failed to conduct a reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse confusion.* The tenor of the intent inquiry shifts when considering reverse confusion due to the shift in the theory of confusion, but *no specific type of evidence is necessary* to establish intent, and the importance of intent and evidence presented will vary by case.

*Marketquest*, 862 F.3d at 934-35 (emphasis added; citations omitted).

Here, examining the evidence in the light most favorable to DLI, as the Court must, leads to the conclusion both Pixar and Disney *did* know of DLI's senior mark and associated goods when it selected the Lots-O'-Huggin' mark by virtue of a trademark search but proceeded regardless.  At deposition, Marc Greenberg testified that Pixar learned of DLI, its mark, and its products in October 2007.  PSUF ¶ 115.

Aside from Pixar, *at least DEI* was informed of the trademark search results

---

[8]    Disney is not alone in this regard.  Critics derided George Lucas's decision to include an army of teddy bears called Ewoks in Return of the Jedi as nothing more than a marketing ploy for the stuffed animals that would be sold.

16

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

*directly*:

> Q.  Do you know what the time frame was when this team came up with the name [Lots-O'-Huggin' Bear]?
>
> A.  I believe it was between March of 2007 to October of 2007, in that time frame.
>
> Q.  Back to this clearance process. I understand this first goes to Pixar's in-house attorneys; correct?
>
> A.  Yes.
>
> Q.  For clearance?
>
> A.  Pixar's in-house attorneys are involved.
>
> Q.  Does it then go to any in-house attorneys with Disney?
>
> A.  **I believe there was correspondence between Pixar attorneys and Disney attorneys** as well as with outside counsel.
>
> Q.  And when you say, "Disney's attorneys," that would be attorneys who work for **Disney Enterprises, Inc.**, as far as you know?
>
> A.  As far as I know, **yes**.

PSUF ¶ 131. In short, at least Pixar and DEI were aware of Plaintiff and its use of LOTS OF HUGS for a bear-like character prior to their adoption and use of LOTS O' HUGGIN. PSUF ¶¶ 115, 131. This is no different from *Dreamwerks*: "Counsel for Dreamwerks conducted a diligent search and discovered the Dreamwerks mark, yet failed to make accommodations or select a different mark." *Dreamwerks*, 142 F.3d at 1132.

Even if the Court were to disregard Greenberg's testimony and view the evidence in the light most favorable to Disney (a clear prohibition in the summary judgment context) and accept that Disney never saw the trademark search report, that does not mean this factor weighs in Disney's favor. As *Marketquest* makes clear, failure to conduct an adequate trademark search and/or disregard the risk of reverse confusion are also evidence of "intent." Here, Disney clearly knew the importance of conducting a trademark search because Disney corporate, in fact, retained outside counsel to conduct one. PSUF ¶ 134. But, if Disney is to be believed, it thereafter closed its eyes to the resulting search, like a proverbial

17

187656.4

ostrich hiding its head in the sand.  Such willful blindness is evidence of the "disregard for the risk of reverse confusion," which *Marketquest* makes clear is evidence of intent.

Ultimately, Disney either knew of DLI's marks or, after paying outside counsel to conduct a trademark search, took pains to avoid actually reviewing the results.  Either way, DLI has evidence of intent, and this factor weighs heavily in its favor.  *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1059 (9th Cir. 1999) (when there is evidence of intent, that weighs heavily in favor of likelihood of confusion).

> 5.    *Both DLI and Disney license their products to third parties who manufacture products.*

Contrary to what Disney would have the Court believe, there is a clear overlap in marketing channels, when one considers the primary consumer of DLI's goods: potential third-party licensees who will manufacture product to sell to consumers.  PSUF ¶ 130.  Disney cannot dispute that it, too, licenses its products to third parties who manufacture and sell licensed goods to the ultimate consumer.  PSUF ¶ 132.  Clearly, then, the parties' marketing channels overlap.

Further, even if DLI were marketing its products directly to consumers, Disney's argument fares no better.  Disney's own motion identifies that Disney sells its *Toy Story 3* merchandise in the Disney Store, Disney Shopping, and other brick-and-mortar and online retailers, at theme parks, and on cruises."  Mot. at p. 20.  Put differently, there is no avenue for Plaintiff to sell its product *without* overlapping with Disney.  That the ubiquity of Disney's marketing has relegated DLI to selling its products at flea markets and local events or donating them to charities does not mean this factor weighs in Disney's favor.  To the contrary, shutting the senior user out of relevant markets is precisely the type of harm against which reverse confusion protects.

187656.4

6.    *DLI sells huggable plush bears not designer cars.*

Both DLI and Disney sell pink "plush bears" which can be "hugged."  While such products may not be impulse buys chosen next to a grocery store conveyor belt, these are not custom works of art, snowmobiles, or designer cars either.  *See, e.g.*, *J.C. Penney Co., Inc. v. Arctic Enters., Inc.*, 375 F.Supp. 913, 915 (D. Minn. 1974) (distinguishing between "sophisticated" purchaser of $1,500 snowmobile versus $40 tires).  At best for Disney and drawing all inferences in DLI's favor, this factor either weighs in DLI's favor slightly or is in equipoise.

7.    *Evidence of actual confusion*

Disney's argument that DLI has "zero" evidence of actual confusion runs headfirst into the evidentiary record.  As noted above, a potential business partner was so concerned about the prospect of actual confusion between DLI's product and Disney's products, it ***insisted*** DLI use a ***different mark*** instead of allowing DLI to market via its senior registered mark:

> [O]f course, we don't want to fight with the 800-pound gorilla [referencing Disney] in the room. ...  [W]e didn't want to get into that. ... So we didn't want to have any confusion in the marketplace with respect to anything related to Disney.  We didn't want to have any issues with respect to that....

PSUF ¶¶ 122.  While Sutton stated that one reason it requested a name change "was because people felt it was a tongue twister," not wanting to face "confusion" between "a bear in one of [Disney's] movies or cartoons called Lots-o'-Hugs or Lots-o'-Huggin' or something like that," was something that was considered and discussed.  PSUF ¶¶ 122, 135.  As a result, there is a triable issue of fact as to exactly *how* significant the potential confusion due to "Lots-O-Huggin'" was in the licensee's consideration.

Disney also stumbles to the extent it seeks to rely on the survey conducted by Hal Poret.  As DLI's expert witness, Isabella Cunningham, has noted, Mr.

19

187656.4

Poret's survey was fundamentally flawed for numerous reasons. Specifically, Poret failed to survey the proper universe, failed to use the proper test format, used flawed stimuli, used a flawed control, and failed to properly control for quality. PSUF ¶ 133.

### 8. *DLI has attempted to expand.*

Lastly, while it is true that DLI has not been able to expand its product line as it would have liked, that is not to say it has not tried or that Disney's use of a junior mark should be permitted to curtail such efforts to do so in the future. *Dreamwerks*, 142 F.3d at 1129 ("[The senior user] clearly caters to the pocket-protector niche, and its convention business has never really taken off. But the longevity of the enterprise illustrates its remarkable resilience, not unlike the starship itself."). As discussed *supra*, DLI has attempted to strike numerous deals with numerous licensees over the years, including deals for television shows. In other words, DLI has sought to expand into the very type of media that Disney has claimed for its own.

### C. According to the Plain Language of the Lanham Act, Plaintiff Can Seek Disgorgement of Profits.

The Lanham Act allows a plaintiff to recover the defendant's profits as a remedy for trademark infringement. *See* 15 U.S.C. § 1117(a). In doing so, it does not distinguish between forward and reverse confusion. Rather, it conditions recovery on "principles of equity." *Id.*

Here, DLI has proffered evidence demonstrating equitable considerations in favor of disgorgement. In particular, as discussed above Defendants knew about DLI's confusingly similar mark prior to producing *Toy Story 3*.

Notwithstanding a genuine dispute of material fact going to the balance of equities in this case, Defendants argue disgorgement is unavailable as a matter of law in reverse confusion cases. This is so, according to Defendants, because in reverse confusion cases defendants do not trade on the goodwill or derive profits

20

from plaintiffs' marks.  Defendants' argument, however, fails in light of the Supreme Court's decision in *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492 (2020).

In *Romag*, the Supreme Court held willful infringement is not a prerequisite to an award of profits in trademark infringement cases.  *Id.* at 1493.  The court explained that the pertinent plain text of section 1117(a) does not contain any willfulness requirement for plaintiffs to recover profits, while other sections of the Lanham Act do impose willfulness requirements to obtain certain remedies.  *Id*. The court refused to read into section 1117(a) a requirement absent from its plain text but present in other parts of the same statute.  *See id.* at 1495.

The principles underlying *Romag* defeat Defendants' arguments for summary adjudication here.  ***First***, the plain text of 1117(a) does not impose any requirement that a defendant have traded on the goodwill or derived profits from the plaintiff's mark in order for a plaintiff to recover profits.  ***Second***, other sections of the Lanham Act do contain such requirements.  For example, section 1125(c)(5)(B)(i) conditions certain remedies for dilution of a famous mark to cases where defendants "willfully intended to ***trade on the recognition of*** the famous mark[.]"  *Id.* (emphasis added.)  Similarly, section 1114(2)(D)(iii) limits liability of domain name registrars to those with "intent to ***profit from such registration*** or maintenance of the domain name."  *Id.* (emphasis added.)  This court should not "read into statutes words that aren't there," particularly "when Congress has (as here) included the term in question elsewhere in the very same statutory provision."  *Romag*, 140 S. Ct. at 1495.

In any event, the pre-*Romag* district court cases on which Defendants rely do not require defendants to have traded on the goodwill of others' marks, separate from any willfulness requirement.  Rather, those courts described "trading on the mark holder's established name ***as part of the willfulness required*** to justify disgorgement."  *Spin Master, Ltd. v. Zobmondo Ent., LLC*, 944 F. Supp. 2d 830,

21

847 (C.D. Cal. 2012) (interpreting *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400 (9th Cir. 1993)).  Therefore, in light of *Romag*, which dispensed with any willfulness requirement to justify disgorgement, *Spin Master* and *Lindy Pen* are no longer good law.  Indeed, before *Romag*, courts in other circuits without any willfulness requirement denied defendants' summary judgment motions regarding disgorgement in reverse confusion cases.  *See Vynamic, LLC v. Diebold Nixdorf, Inc.*, 2019 WL 193660, *11 (E.D. Pa. Jan. 15, 2019); *Coryn Group II, LLC v. O.C. Seacrets, Inc.*, 2010 WL 1375301, *7  (D. Md. Mar. 30, 2010).

Finally, the Ninth Circuit has recognized deterrence as a rationale for disgorgement.  *See, e.g., Playboy Enters., Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272 (1982) ("[I]t is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement."); *see also* 5 McCarthy on Trademarks and Unfair Competition § 30:64 (5th ed.) (identifying deterrence as one justification for disgorgement).  The deterrence rationale applies here, where the evidence suggests Defendants intentionally infringed DLI's mark.

### D.    Equitable Tolling Saves DLI's Claims Against DEI & DCP.

"It is hornbook law that limitations periods are customarily subject to equitable tolling." *Young v. United States*, 535 U.S. 43, 49 (2002) (citations and quotation marks omitted); *accord O'Donnell v. Vencor Inc.*, 466 F.3d 1104, 1112 (9th Cir. 2006).  For example, courts have employed equitable tolling to preserve a claim when a lawsuit was timely filed in the first court, dismissed for lack of personal jurisdiction, and then later refiled in the correct court. *Tyrrell v. BNSF Ry. Co.*, No. 4:17-CV-04120, 2018 WL 2944529, *30-31 (D.S.D. June 12, 2018) (collecting cases).  "[The] focus is on the plaintiff's particular circumstances and the fairness, given those circumstances, of holding him to a hard-and-fast filing deadline." *Sec'y, United States DOL v. Preston*, 873 F.3d 877, 884 (11th Cir. 2017).

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

187656.4

Here, Disney focuses solely on *length of time*, but the circumstances here are unusual.  In the Third Amended Complaint (the operative pleading when the Fifth Circuit dismissed DEI and DCP for lack of jurisdiction), all of the Disney Defendants were named as parties.  Dkt. No. 136.  Upon remand, the Magistrate and district court considered those Defendants' *previously filed motion to transfer venue* to this Court (which motion DEI and DCP had *joined* in).  Dkt. 165.  Consequently, it was reasonable for DLI to *wait* on a ruling on whether the entire case would be transferred to this Court rather than immediately filing a separate action in California against DEI and DCP.  That transfer occurred, and it is reasonable, equitable, and judicially efficient to allow this whole case to be decided in one proceeding against all the Disney Defendants in this Court (just as DEI and DCP had requested).  Under these unique circumstances, the Court should rule any limitations period was equitably tolled.

## IV.   **CONCLUSION**

In its closing paragraph, the *Dreamwerks* court noted "[t]his dispute could have been avoided had DreamWorks been more careful, or a tad more creative, in choosing its name." *Id.*, 142 F.3d at 1132.  The same is true here.  Disney either knew of DLI's mark but decided to barrel forward anyway, or it failed to conduct an adequate trademark search.  Either way, the result is the same: it steamrolled DLI's mark, and DLI deserves to have its day in court.  For the foregoing reasons, Disney's motion for summary judgment should be denied.

Dated:  April 2, 2021                          DTO LAW


                                              By: _/s/ William A. Delgado_____
                                                   William A. Delgado
                                                   Megan O'Neill
                                                   Attorneys for Plaintiff
                                                   DIECE-LISA INDUSTRIES, INC.

23

187656.4

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Electronic Service List for this Case.


Dated:  April 2, 2021                    */s/ William A. Delgado*
                                          William A. Delgado

24

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

187656.4