# Delgado Decl.
# Ex. A
## Altschul Dep. Tr.

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                       MARSHALL DIVISION

 3      DIECE-LISA INDUSTRIES,        )
        INC.,                         )
 4                                    )
             Plaintiff,               )
 5                                    )
        VS.                           ) CASE NO.: 2:12-CV-00400
 6                                    )
        DISNEY STORE USA, LLC and     )
 7      DISNEY SHOPPING, INC.,        )
                                      )
 8           Defendants.              )

 9                  ------------------------------------

10              ORAL AND VIDEOTAPED DEPOSITION OF

11                    RANDICE LISA ALTSCHUL

12                       MARCH 19, 2014

13                  ------------------------------------

14          ORAL AND VIDEOTAPED DEPOSITION OF RANDICE LISA

15   ALTSCHUL, produced as a witness at the instance of the

16   DEFENDANTS, and duly sworn, was taken in the

17   above-styled and numbered cause on March 19, 2014, from

18   9:33 a.m. to 6:45 p.m., before Kimberly Byrns Buchanan,

19   CSR, RPR in and for the State of Texas, reported by

20   machine shorthand, at the offices of Whitaker Chalk

21   Swindle & Schwartz PLLC, 301 Commerce Street,

22   Suite 3500, Fort Worth, Texas 76102, pursuant to the

23   Federal Rules of Civil Procedure and the provisions

24   stated on the record or attached hereto.

25
```



```
 1       A.    I like that.
 2       Q.    All right.  You understand that you're
 3  appearing here today as a corporate representative.  You
 4  understand that?
 5       A.    Uh-huh.
 6       Q.    Okay.  And the -- the name of the company that
 7  you're -- so you're not appearing as -- in your personal
 8  capacity, but rather as the person designated by a
 9  company called Diece-Lisa Industries, Inc.  You
10  understand that?
11       A.    Correct.
12       Q.    Okay.
13       A.    Uh-huh.
14       Q.    Who -- what is the business of Diece-Lisa
15  Industries, Inc.?
16       A.    I'm an inventor.  The company invents and
17  develops products, properties.
18       Q.    And who are the owners of Diece-Lisa Industry,
19  Inc.?
20       A.    Me.
21       Q.    It is a sole proprietorship?
22       A.    It's a corporation.
23       Q.    Okay.  It's a corporation.
24             Does anyone else have any interest in the
25  corporation?
```



```
 1        A.    Nope.
 2        Q.    Just you.  You're hundred-percent owner?
 3        A.    Yes.
 4        Q.    Okay.  Does the corporation have any -- any
 5   officers other than yourself?
 6        A.    Nope.
 7        Q.    Does the corporation have any employees other
 8   than yourself?
 9        A.    Nope.
10        Q.    Does the corporation have an office?
11        A.    Yes.
12        Q.    Where is that office?
13        A.    36 Cecelia Avenue, Cliffside Park,
14   New Jersey 07010.
15        Q.    Okay.  Does the Corporation keep minutes?
16        A.    Define.
17        Q.    Does the Corporation have records that -- that
18   indicate what its operations are year to year?
19        A.    I keep a record of things that I do because of
20   meetings and contracts and things like that.
21        Q.    Okay.  But you don't have a -- you don't have
22   anything that you keep as a formal corporate minute
23   book?
24        A.    No, I do not.
25        Q.    Okay.
```



```
 1        A.    Probably Alan Sutton and Ivy Sutton.
 2        Q.    And that conversation occurred sometime in the
 3   first quarter of two -- 2012?
 4        A.    That is correct.
 5        Q.    Were they involved -- were the Suttons involved
 6   in the decision to bring this lawsuit in 2012?
 7        A.    They didn't even know about it.  They -- when I
 8   said to them -- when they first told me about it, I said
 9   I'd deal with it.  I would take care of it.  And they
10   didn't -- apparently didn't pick off that that meant
11   that I was going to deal with it legally.
12        Q.    Other than the discussion that you testified to
13   with the Suttons that occurred in the first quarter
14   where they said that they wanted to change the name
15   because they might want to approach Disney with the
16   product --
17        A.    No, it wasn't -- that wasn't the reason they
18   wanted to change the name.  They want -- thought of
19   confusion.
20              They said:  They've got Lots-O'-Huggins'
21   in Toy Story 3.  It's the biggest property ever done.
22              They said:  And we're Lots Of Hugs.  It's
23   going to be confused at retail.  They're going to think
24   we're a part of that, and we're not a part of that.  We
25   have to change it.  It's just going to end up being a
```



```
 1   legal mess.
 2              And that -- they said, We want to go to
 3   Disney and show them the Hugs too.
 4              So it's just like:  All right.  Do what
 5   you have to do.
 6              MR. HARDIN:  I move to strike as
 7   nonresponsive.
 8       Q.   (BY MR. HARDIN)  Did you have any other
 9   conversations at any other time other than that first --
10   that one conversation with them?
11       A.   When they first told me that they wanted to add
12   domains -- because I was purchasing a lot of domains and
13   I was buying -- buylotsofhugs.com, givelotsofhugs.com.
14   They said, Ran, we want to, you know, do some HUG-A-LOTS
15   too.  So it was like, okay.  We'll add that in there.
16              So I started buying buyhugalots domains,
17   different things, buyhugalots, you know, sellhugalots,
18   whatever I bought.  And -- gethugalotsandkisses, or
19   whatever.  I bought a lot of different stuff.
20              But -- and the decision, if I remember
21   correctly, was on -- yeah.  She just gave me presents.
22   So March 28th, I was down there for a meeting.  And they
23   said they made a decision to get rid of Lots Of Hugs
24   altogether, and they just wanted to do the HUG-A-LOTS.
25   They really didn't want the confusion.
```



1    Q.   That's a yes?
2    A.   Yes.
3    Q.   Okay.  And was this the tag that was attached
4  to the products that were sold through QVC?
5    A.   Yes, it was.
6    Q.   And it also bears on it, of course, the USA
7  Olympic seal, correct?
8    A.   Yes, it does.
9    Q.   The other side of the -- of the tag shows some
10 operation instructions?
11   A.   Yes.
12   Q.   "Panda Hugs You", "Panda Hugs Others", implying
13 that that's how the product should be used, correct?
14   A.   It goes both ways.
15   Q.   It goes -- one can hug oneself or one can hug
16 others?
17   A.   That is correct.
18             (Exhibit 114 marked.)
19             THE WITNESS:  Thank you.
20   Q.   (BY MR. HARDIN)  I've placed before you what
21 we've marked for identification DX 114.  It bears
22 production number DLI000038.  Can you tell us what this
23 is?
24   A.   That was the original presentation artwork for
25 the Snugglers, which became Lots Of Hugs.

1    Q.   So this is what you showed the folks at
2    Happiness Express?
3    A.   That is correct.
4    Q.   And that was -- I think it has a date that's
5    hard to read but it's --
6    A.   I think it was 1995, looks like.
7    Q.   1995.  Okay.
8              And this was the product that was later
9    renamed by Happiness Express "Lots Of Hugs"?
10   A.   That is correct.
11             (Exhibit 115 marked.)
12   Q.   (BY MR. HARDIN)  I've placed before you a
13   document we marked for identification 115 that bears
14   production numbers DLI 15 through 23.
15             Is this a copy of your -- signed copy of
16   your license agreement with Happiness Express?
17   A.   That is correct.
18   Q.   And were you paid -- back on page 22, the third
19   point -- second point is Royalty Rates, and the third
20   point is Advance, $7,500.  Were you paid the $7,500?
21   A.   I believe I was.
22   Q.   So you were paid $7,500 in approximately
23   July 1995?
24   A.   I believe I was.
25             (Exhibit 116 marked.)



```
 1   property -- your alleged property was Lots Of Hugs.
 2   Correct?
 3        A.   My property is Lots Of Hugs.
 4        Q.   Right.  So they weren't confused?
 5        A.   I can't speak for them.
 6        Q.   Okay.  Well, what you have testified to is what
 7   they told you was that they were aware that Disney had a
 8   character called "Lotso" and sometimes
 9   "Lots-O'-Huggin'".  You had a trademark called "Lots Of
10   Hugs", and they prefer not to use your trademark in
11   light -- in light of Disney's use.  Correct?
12        A.   They had told me that Disney had in Toy Story 3
13   Lots-O'-Huggins', short Lotso, but Lots-O'-Huggins' was
14   his name.  And I do not know whether they actually had
15   somebody come to them in confusion of it or not.  I
16   can't speak for them.
17        Q.   Okay.
18        A.   Okay?
19             But I was told that there would be
20   confusion because ours was Lots Of Hugs and theirs was
21   Lots-O'-Huggins', and they didn't want to have to go
22   into a problem with Disney.
23        Q.   So you were told by them that they thought
24   there could be confusion and they didn't want to -- to
25   go forward with your mark because of their concern that
```



```
 1   there could be confusion?
 2        A.   They told me there was confusion with that and
 3   they wanted to switch to HUG-A-LOTS --
 4        Q.   Did they --
 5        A.   -- and I said all right.  I did not like the
 6   idea, but I said all right.
 7        Q.   Did -- did they report to you any person that
 8   had told them that there was -- that they were confused
 9   about the two marks?
10        A.   I do not recall talking to them about any
11   particular person.  I did not talk with them about their
12   buyers.
13        Q.   Okay.  And, in fact, the only document that
14   I've seen produced is a copy of a diary record that you
15   made regarding that conversation.  Isn't that correct?
16        A.   That is correct.  I made note to it.
17        Q.   All right.  You made a note of the fact that
18   because of Disney's use they wanted to change the mark
19   to HUG-A-LOTS?
20        A.   That is correct.
21        Q.   Okay.  Other than that conversation and that
22   note in the diary, do you have any other evidence that
23   anyone has ever been confused about the source of the
24   Lots-O'-Huggin' bear compared to your product?
25        A.   That's enough.
```



```
 1     Q.   What's enough?
 2     A.   Having your licensee tell you a brand that you
 3   developed for 19 years is in conflict with Disney's
 4   mark.  And I said, Well, it's my mark.  How can that
 5   even be?  And I said, I will deal with that.
 6     Q.   So is the answer that --
 7          MR. HARDIN:  I'll strike that as
 8   nonresponsive.
 9     Q.   (BY MR. HARDIN)  My question was:  Has anyone
10   else -- do you have any evidence other than?  Is the
11   answer to that, no, you don't have any other evidence?
12     A.   They were my licensee.  They were the only
13   ones.
14     Q.   I understand that.  Would you now answer my
15   question?
16     A.   They were the only ones.
17     Q.   That's not my question.
18          My question is:  Do you have -- isn't it a
19   fact you have no other evidence of any kind of confusion
20   other than that one conversation with the Suttons?
21     A.   No one else other than the Suttons, who were my
22   licensee, who addressed it with me.
23     Q.   Okay.  So that's the only evidence you have of
24   anyone who possibly thought there could be confusion, is
25   your own licensee?
```

