William A. Delgado (SBN 222666)
  wdelgado@dtolaw.com
Megan O'Neill (SBN 220147)
  moneill@dtolaw.com
DTO LAW
915 Wilshire Boulevard, Suite 1950
Los Angeles, California 90017
Telephone: (213) 335-6999
Facsimile: (213) 335-7802

Richard L. Schwartz (*pro hac vice*)
  rschwartz@whitakerchalk.com
WHITAKER CHALK SWINDLE
& SCHWARTZ PLLC
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102
Telephone: (817) 878-0524
Facsimile: (817) 878-0501

Attorneys for Plaintiff
DIECE-LISA INDUSTRIES, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIECE-LISA INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>DISNEY ENTERPRISES, INC., et al.,<br><br>Defendants. | 2:20-CV-09147-TJH-JCx<br>Hon. Terry J. Hatter, Jr.<br><br>**PLAINTIFF DIECE-LISA INDUSTRIES, INC.'S RENEWED OPPOSITION TO DEFENDANTS WALT DISNEY STUDIOS MOTION PICTURES AND BUENA VISTA HOME ENTERTAINMENT, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>UNDER SUBMISSION |

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ............................................................................... 1

II.   BACKGROUND .................................................................................. 2

    A.    Statement of Relevant Facts................................................. 2

    B.    Relevant Procedural History ................................................ 4

III.  ARGUMENT ..................................................................................... 5

    A.    WDSMP and BVHE Distributed *Toy Story 3*, Which Advertised the Infringing Merchandise Sold by Other Disney Entities and Was Not Solely Expressive Content. ........................... 5

        1.    Disney films play a critical role in Disney's symbiotic products and entertainment ecosystem, introducing characters to be exploited in myriad forms. ........................... 6

        2.    Not merely expressive, Toy Story 3 operates in part as an advertisement for toys and characters, including Lots-o'-Huggin' Bear, concurrently sold as consumer products............................................................ 8

    B.    Whether WDSMP and BVHE Used the Lots-o'-Huggin' Bear as a Source Identifier Presents Triable Questions of Fact, Which Forecloses Application of *Rogers* as a Matter of Law............................................................................. 12

        1.    Disney admits its film characters are source identifiers. ........ 13

        2.    WDSMP and BVHE used Lots-o'-Huggin' Bear alongside other distinctive characters to market Toy Story 3 as a Disney movie. .................................................... 13

        3.    That Lots-o'-Huggin' Bear serves as a source identifier is clear from consumer perception........................ 15

    C.    WDSMP and BVHE's Cited Cases Are Inapposite. ....................... 17

    D.    Alternatively, *Rogers* Does Not Apply to This Case of Reverse Confusion. .......................................................... 18

IV.   CONCLUSION ........................................................................... 20

1011421

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
   600 U.S. 412 (2023) ................................................................. 16, 17

5

6

*AMF Inc. v. Sleekcraft Boats*,
   599 F.2d 341 (9th Cir. 1979) ........................................................ 16

7

8

*Appliance Liquidation Outlet, L.L.C. v. Axis Supply Corp.*,
   105 F.4th 362 (5th Cir. 2024) ....................................................... 12

9

10

*Beer Nuts, Inc. v. King Nut Co.*,
   477 F.2d 326 (6th Cir. 1973) ........................................................ 15

11

12

*Brown v. Elec. Arts, Inc.*,
   724 F.3d 1235 (9th Cir. 2013) ...................................................... 19

13

14

*CPC Properties, Inc. v. Dominic, Inc.*,
   2013 WL 4457338 (E.D. Pa. Aug. 21, 2013) ................................ 15

15

16

*Down to Earth Organics, LLC v. Efron*,
   2024 WL 1376532 (S.D.N.Y. Mar. 31, 2024) .............................. 17

17

18

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
   983 F.3d 443 (9th Cir. 2020) ........................................................ 19

19

20

*Dreamwerks Prod. Grp. v. SKG Studio*,
   142 F.3d 1127 (9th Cir. 1998) ........................................................ 6

21

*In Re Eagle Crest, Inc.*,
   96 U.S.P.Q.2d 1227 (T.T.A.B. 2010) ............................................ 16

22

23

*In re GO & Assocs.*,
   90 F.4th 1354 (Fed. Cir. 2024) ..................................................... 12

24

25

*Hara v. Netflix*,
   2025 WL 2102547 (9th Cir. July 28, 2025) ............................. 17, 18

26

27

*HomeVestors of Am., Inc. v. Warner Bros. Discovery, Inc.*,
   2023 WL 6880341 (D. Del. Oct. 18, 2023) ................................... 12

28

DLI'S RENEWED OPP'N TO WDSMP & BVHE'S PARTIAL MOT. FOR SUMM. J.

1011421

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*,
    599 U.S. 140 (2023) ................................................................. *passim*

*Jockey Int'l Inc. v. Butler*,
    3 U.S.P.Q.2d 1607, 1987 WL 124296 (T.T.A.B. 1987) ................................. 15

*JTH Tax LLC v. AMC Networks Inc.*,
    694 F. Supp. 3d 315 (S.D.N.Y. 2023) ............................................. 17

*Marketquest Grp., Inc. v. BIC Corp.*,
    862 F.3d 927 (9th Cir. 2017) ....................................................... 19

*McGillvary v. Netflix, Inc.*,
    2024 WL 3588043 (C.D. Cal. July 30, 2024) ................................... 17

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
    818 F.2d 254 (2d Cir. 1987) ....................................................... 15

*Pirv v. Glock, Inc.*,
    2010 WL 11579455 (D. Or. July 19, 2010) ................................... 12

*Rogers v. Grimaldi*,
    875 F.2d 994 (2d Cir. 1989) ................................................ *passim*

*In re Vox Populi Registry Ltd.*,
    25 F.4th 1348 (Fed. Cir. 2022) .................................................. 15

**Statutes**

15 U.S.C. § 1114.............................................................................. 6, 9

15 U.S.C. § 1125.............................................................................. 6, 9

DLI'S RENEWED OPP'N TO WDSMP & BVHE'S PARTIAL MOT. FOR SUMM. J.

1011421

Plaintiff Diece-Lisa Industries, Inc. ("DLI") respectfully submits this memorandum in opposition to Defendants Walt Disney Studios Motion Pictures ("WDSMP") and Buena Vista Home Entertainment, Inc.'s ("BVHE") Motion for Partial Summary Judgment (ECF No. 398).[1]

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

This Court previously held the First Amendment does not bar DLI's trademark infringement claims.  Nothing in WDSMP and BVHE's latest motion—their ***third*** attempt at summary judgment—compels a different result.  The discovery DLI has conducted since only reinforces this Court's original conclusion.

As this Court has explained, Defendants used a "slightly modified" version of DLI's LOTS OF HUGS trademark as the name of a major character in *Toy Story 3*, "Lots-o'-Huggin' Bear."  5/1/24 Order, ECF No. 386 at 11:18.  Defendants used that mark to designate ***Disney*** as the source of Lots-o'-Huggin' Bear and to sell Lots-o'-Huggin' Bear merchandise.  *See id.* at 11:23–27.  The First Amendment provides no special protection when a defendant uses a mark "***at least in part***" as a source identifier.  *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 156 (2023) (emphasis added).

In seeking partial summary judgment, WDSMP and BVHE proceed from a faulty premise.  They assume they are not liable for trademark infringement because they merely distributed the *Toy Story 3* film to theaters and retailers and did not distribute or sell any infringing merchandise.  But the Lanham Act imposes liability not only for selling, but also for ***advertising*** infringing goods.  Here, a reasonable jury could conclude *Toy Story 3* serves, in part, as an advertisement for related merchandise.  Indeed, Disney's corporate strategy documents acknowledge

---

[1]    There are 12 other Defendants in this case.  All 14 Defendants are subsidiaries of The Walt Disney Company.

as much.  Furthermore, WDSMP itself advertised a "real" version of Lots-o'-
Huggin' Bear as part of its promotion of the film.

Even putting aside the infringing merchandise, partial summary judgment
would still be improper.  Whether WDSMP and BVHE used Lots-o'-Huggin' Bear
as a source identifier in conjunction with the film is a genuine dispute of fact.
Contrary to their representations, WDSMP and BVHE did much more than simply
distribute *Toy Story 3* to movie theaters and retailers.  They each spearheaded a
multifaceted marketing campaign with Lots-o'-Huggin' Bear front and center,
alongside other characters Disney itself has admitted are inherently distinctive and
source identifying, such as Woody and Buzz Lightyear.  From this record, a jury
could conclude WDSMP and BVHE used Lots-o'-Huggin' Bear to designate
Disney as the source of the film and the character.

Assuming those arguments don't carry the day, this Court should reassess
whether *Rogers* applies in any event, given this is a case of *reverse* confusion.
Justice Gorsuch admonished lower courts to apply *Rogers* carefully.  Any careful
application would reveal *Rogers* is unworkable in cases of reverse confusion.

This Court should deny WDSMP and BVHE's Motion for Partial Summary
Judgment.

## II.    BACKGROUND

### A.    Statement of Relevant Facts

DLI is a toy and game company solely owned by Randice-Lisa Altschul.
*See* Pl.'s Renewed Sep. Stmt. of Genuine Disputes & Addt'l Facts ("Sep. Stmt.")
¶¶ 21–22.  DLI licenses innovative concepts to third parties who, in turn,
manufacture and sell products to retailers, who ultimately sell to consumers.  *See
id.* ¶ 22.  In the mid-1990s, Altschul and DLI conceived of a novel idea for a
wearable stuffed animal having sleeve-like openings in which the user could place
their arms.  *See id.* ¶ 23.  That idea became LOTS OF HUGS, for which DLI

DLI'S RENEWED OPP'N TO WDSMP & BVHE'S PARTIAL MOT. FOR SUMM. J.

1011421

obtained federally registered trademarks in 1997 and 2008 (the "Mark"). *See id.* ¶ 24.

Defendants knew about DLI's Mark. *See* 5/1/24 Order, ECF No. 386 at 18:17–18. Nevertheless, Defendants WDSMP and BVHE distributed the film *Toy Story 3* in 2010, which features an integral character named Lots-o'-Huggin' Bear.[2] *See* Sep. Stmt. ¶¶ 2, 5, 13. WDSMP and BVHE contend they did not, in any way, "engage[] in any use or exploitation of 'Lots-o'-Huggin' Bear' apart from their theatrical and home video distribution of *Toy Story 3*." Mot. 9:11–16 ("Specifically, WDSMP and BVHE distributed a motion picture in which 'Lots-o'-Huggin' Bear' is spoken once, as the full name of the primary antagonist."). Untrue.

In fact, WDSMP and BVHE also developed and distributed *advertisements* for *Toy Story 3* prominently featuring Lots-o'-Huggin' Bear. These included theatrical trailers, commercials, posters, banners, bus shelter ads, and collectable trading cards. *See* Sep. Stmt. ¶¶ 30–31. At the same time, WDSMP and BVHE's sister companies licensed and sold merchandise featuring Lots-o'-Huggin' Bear. *See id.* ¶ 32. That is, the same character introduced to audiences and consumers by way of the very film WDSMP and BVHE distributed. This merchandise included a stuffed toy bear, keychains, puzzles, toy cars, books, video games, and more. *See id.* Consistent with Disney's long-standing corporate strategy, the merchandise both capitalized on the success of *Toy Story 3* (and consumers' corresponding familiarity with the character after seeing the film) and fueled additional excitement about the film.

As a result of the proliferation of "Lots-o'-Huggin Bear," Defendants have destroyed the value of DLI's LOTS OF HUGS Mark. *See id.* ¶ 25.

---

[2] Pixar, which created *Toy Story 3*, is now a subsidiary of Disney. *See* 5/1/24 Order, ECF No. 386 at 3:26–4:2.

3

1011421

## B.    Relevant Procedural History

DLI sued Defendants under a "reverse confusion" theory for infringement of DLI's Mark.  *See* ECF No. 325.  Defendants filed their first Motion for Summary Judgment in March 2021.  *See* ECF No. 332.  They argued that their use of Lots-o'-Huggin' Bear was protected by the First Amendment pursuant to the test from *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989).  Under the *Rogers* test as implemented in the Ninth Circuit at that time, where the defendant used a mark as part of an expressive work in any capacity, the plaintiff was required to show the defendant's use "ha[d] no artistic relevance to the underlying work whatsoever," or, if the mark did have some artistic relevance, that the defendant's use "explicitly misle[d] as to the source or the content of the work."  *Id.* at 999.  Constrained by the Ninth Circuit's adoption of *Rogers*, this Court granted Defendants' motion.  *See* ECF No. 357.

DLI appealed.  *See* ECF No. 359.  The Ninth Circuit summarily affirmed.  *See* ECF No. 373.  DLI then petitioned the Supreme Court for a writ of certiorari.  *See* 2022 WL 12639245 (Oct. 11, 2022).  While DLI's petition was pending, the Supreme Court issued its opinion in *Jack Daniel's Properties, Inc. v. VIP Products, LLC*, 599 U.S. 140 (2023).  In reversing the Ninth Circuit, the Supreme Court held the *Rogers* test ***does not apply*** when an alleged infringer uses a mark "at least in part for source identification."  *Id.* at 156 (cleaned up).  Shortly thereafter, the Supreme Court granted DLI's petition in this case and vacated and remanded for further consideration in light of *Jack Daniel's*.  *See* 143 S. Ct. 2634 (2023).  After additional briefing, the Ninth Circuit remanded to this Court.  *See* ECF No. 378.

In October 2023, Defendants filed a Renewed Motion for Summary Judgment.  *See* ECF No. 382.  In May 2024, this Court largely denied that motion.  *See* ECF No. 386.  It held Defendants use of a "slightly modified" version of the Mark "designated, at least in part, the source of the Disney Defendants' Lots-o'-

4

DLI'S RENEWED OPP'N TO WDSMP & BVHE'S PARTIAL MOT. FOR SUMM. J.

1011421

Huggin' Bear[.]" *Id.* at 11:18, 11:24–25.  As a result, this Court found *Rogers* was "no longer applicable, here, to bar liability." *Id.* at 11:23–27.  Moreover, DLI "met its burden of setting forth a *prima facie* case that its consumers are likely to mistakenly believe that the source of its goods bearing its Mark is the Disney Defendants." *Id.* at 19:5–7.

WDSMP and BVHE filed a Motion for Reconsideration.  *See* ECF No. 387.  They argued *Rogers **did*** apply to them individually, because they merely distributed *Toy Story 3*, which they argued only features the Lots-o'-Huggin' mark in an expressive manner entitled to protection under *Rogers*.  *See id.* at 7:12–23.  This Court denied the motion because Defendants did not previously raise that argument.  *See* ECF No. 393.  However, it *sua sponte* allowed WDSMP and BVHE to file the instant Motion "limited to whether the *Rogers* test is applicable to their use of Lots-o'-Huggin' Bear." *Id.* at 6:14–15.  It reasoned "this is a complicated case with evolving issues, [and] it is possible that the Disney Defendants might not have foreseen th[at] issue . . . before [they] received the Court's May 1, 2024, order." *Id.* at 6:10–12.

In subsequently bringing their Motion for Partial Summary Judgment, WDSMP and BVHE relied on declarations from previously undisclosed individuals.  *See* ECF Nos. 398-2, 398-3.  Accordingly, this Court allowed DLI to depose those individuals and take further discovery into the "relationship between *Toy Story 3* and the sale of Lots-o-Huggin' Bear merchandise." 3/12/25 Order, ECF No. 412 at 7:21–23.

## III.  ARGUMENT

### A.  WDSMP and BVHE Distributed *Toy Story 3*, Which Advertised the Infringing Merchandise Sold by Other Disney Entities and Was Not Solely Expressive Content.

WDSMP and BVHE contend they "used 'Lots-o'-Huggin' Bear' only as expressive content" because they "did not sell and had no involvement

whatsoever" with merchandise incorporating the character.  Mot. 9:11–20.  But they ignore that the Lanham Act imposes liability not only for *selling* but also for "***advertising***" infringing goods.  15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(B) (emphasis added).  Here, a reasonable jury could conclude WDSMP and BVHE did just that by distributing *Toy Story 3*.  Apart and in addition to any expressive content, *Toy Story 3* functioned as an advertisement for related goods, including Lots-o'-Huggin' Bear merchandise.

> 1.    *Disney films play a critical role in Disney's symbiotic products and entertainment ecosystem, introducing characters to be exploited in myriad forms.*

As this Court has recognized, "toys and movies are complementary."  5/1/24 Order, ECF No. 386 at 16:7 (citing *Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir. 1998)).  Disney takes this idea several steps further, creating animated films that spawn countless forms of merchandise, amusement park entertainment, publications, and more related to those films.  Walt Disney himself envisioned Disney's theatrical films as the central piece of a complex ecosystem, "provid[ing] characters" that could be "exploit[ed]" in the form of licensing and merchandising, "feed[ing] in raw material for books" that would, in turn, "plug[] films," and "provid[ing] saleable [and] useable material" to Disneyland:

DLI'S RENEWED OPP'N TO WDSMP & BVHE'S PARTIAL MOT. FOR SUMM. J.

1011421

Declaration of William A. Delgado ("Delgado Decl."), Ex. BB at 57. More recently, Disney explained to its investors that its "businesses—the *studios*, media platforms, parks, cruise lines, and *consumer products—work together as a whole* and are *fueled by original studio content*[.]" Sep. Stmt. ¶ 46.

Ample evidence reinforces that Disney films operate, in part, to fuel this synergistic exploitation of these films' stories and characters by the various Disney entities. For example, Defendant Disney Store USA, LLC's ("Disney Store") corporate representative emphasized the importance of releasing films and merchandise contemporaneously, *see id.* ¶ 33, and Defendant Disney Consumer Product, Inc.'s ("DCP") corporate representative agreed that Disney films can boost sales of related merchandise, *see id.* ¶ 34; *see also id.* ¶ 51 (██████

██████████

7

1011421

1  following the film's release).  BVHE's first corporate representative, Lori Elias,

2  similarly testified that "oftentimes these titles are used to drive traffic into the store

3  . . . in the hopes that consumers will put more items in their market basket."  *See*

4  *id.* ¶ 37.

5        Later testifying in her individual capacity,[3] Elias reiterated that BVHE's

6  releases of DVDs and Blu-ray discs for Disney films "were coordinated

7  companywide," to ensure any given release was timed for "the right opportunity

8  . . . to maximize retail."  *Id.* ¶ 38.  Indeed, during her time at BVHE, Elias testified

9  BVHE would, together with other entities such as Disney Consumer Products and

10  Walt Disney Records, collaborate in order to "increase [their] shared voice to help

11  maximize [their] reach and awareness."  *Id.*  Such strategies might include shared

12  retail displays in brick-and-mortar retailers, retailer circulars featuring the DVDs in

13  conjunction with related products, or DVD gift sets.  *Id.* ¶ 39.

14          2.   *Not merely expressive,* Toy Story 3 *operates in part as an*
15               *advertisement for toys and characters, including Lots-o'-*
16               *Huggin' Bear, concurrently sold as consumer products.*

17        Without *Toy Story 3*, there would be no *Toy Story 3* merchandise and no *Toy*

18  *Story 3* character actors at Disney parks.  And if *Toy Story 3* had not been

19  distributed to theaters and retailers, it never would have reached viewers who

20  would become consumers of the related merchandise.  WDSMP and BVHE's

21  "involvement" in Lots-o'-Huggin' Bear merchandise was thus straightforward:

22  they distributed the film introducing—and advertising—the new character to

23  consumers to drive interest in the related merchandise.  Indeed, ▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26  ▮ *See id.* ¶¶ 27–28.  Why would they have done so if not for a perceived

27

28  _____

[3]  Elias is no longer employed by BVHE.

1

2

3    Because the Lanham Act imposes liability for *advertising* infringing

4    products, *see* 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(B), WDSMP and BVHE cannot

5    escape liability simply because they do not themselves sell the products based on

6    the film they distributed.  The Supreme Court's discussion in *Jack Daniel's* about

7    the movie *The Hangover: Part II* is instructive.  *The Hangover* filmmakers used a

8    modified LOUIS VUITTON mark ("Lewis Vuitton") exclusively as a form of

9    commentary about a character in the film.  *See* 599 U.S. at 157.  That use was

10    protected by *Rogers*.  *See id*.  Critically, however, the Court reasoned the analysis

11    would *differ* if filmmakers used that same modified mark "to make inroads in the

12    suitcase market."  *Id*.  That would have been "paradigmatic infringement."  *Id*.

13    Such is the case here.  WDSMP and BVHE distributed a film that used a

14    "slightly modified" Mark so that Disney could *make inroads in the toy market*.  *See*

15    Sep. Stmt. ¶ 40.  This has paid off handsomely for their sister Disney entities:

16    While the film itself grossed $1 billion in box office receipts, it generated almost

17    *$10 billion* in retail sales—revenues which "flow up" to the same ultimate parent

18    company.  *See* Sep. Stmt. ¶¶ 41–42.  WDSMP even created a "fake" vintage-

19    looking commercial advertising a real, stuffed version of Lots-o'-Huggin' Bear as

20    part of its promotion of the film leading up to its release.  *See id*. ¶ 43.

21

22

23    

24

25

26

27

28

9

DLI'S RENEWED OPP'N TO WDSMP & BVHE'S PARTIAL MOT. FOR SUMM. J.

1011421

1    While WDSMP did not go on to *sell* the stuffed bear (which was sold alongside

2    other merchandise by, e.g., Defendant Disney Store), *see id.* ¶ 44, its distribution

3    of *Toy Story 3* was an indisputably critical step in driving consumer interest in the

4    toys and merchandise based on the characters from the film. *See id.* ¶¶ 33–35, 40–

5    41. And BVHE, for its part, advertised and directly sold consumer products—

6    DVDs and Blu-rays—incorporating the "slightly modified" Lots-o'-Huggin' Bear

7    Mark. *See* id. ¶¶ 36–40.

8    Indeed, WDSMP and BVHE's liability here is ***even greater*** than in the

9    Supreme Court's "Lewis Vuitton" hypothetical. Not only has their distribution of

10   the film allowed sister entities to make inroads in sales of merchandise based on

11   the film and its characters, that merchandise has in turn boosted interest in *Toy*

12   *Story 3* and subsequent *Toy Story* films. This is by design: Just as Walt Disney

13   recognized in the 1950s, Disney today (as summarized in a recent presentation to

14   investors) continues to recognize that films are not merely a pipeline to

15   merchandise; rather, films and merchandise are ***symbiotic properties***, each

16   boosting consumer interest in the other:



25   *See* Sep. Stmt. ¶ 47.

26   It defies reason to deny the inextricable link between the film and the

27   corresponding merchandise. After spending the day playing with her Buzz

28   Lightyear action figure or Lots-o'-Huggin' Bear toy, wouldn't a child be more

DLI'S RENEWED OPP'N TO WDSMP & BVHE'S PARTIAL MOT. FOR SUMM. J.

1011421

likely to ask her parents to buy or stream the movie where she could see her ▮▮▮▮▮ on screen? *Id.* ¶ 28. For that reason, Lots-o'-Huggin' Bear merchandise is not sold in a vacuum; it is marketed and sold by WDSMP and BVHE's sister entities as merchandise *related to Toy Story 3*, the Disney film.






*See* Sep. Stmt. ¶¶ 32, 49.[4]

---

[4]    In fact, WDSMP and BVHE's sister company Disney Store failed to produce all relevant and responsive documents evidencing this clear relationship between the film WDSMP and BVHE distributed and sales of Lots-o'-Huggin' Bear merchandise by DCP. Disney Store produced retail analytics ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Delgado Decl., Ex. II, at DIS-DL00001618. Yet it refused to produce comparable analytics for prior or subsequent time periods. Delgado Decl., Ex. LL. In other words, WDSMP and BVHE rely on two declarations to claim they had no role in sales of Lots-o'-Huggin' Bear merchandise, while other Disney Defendants refused to produce documents tending to disprove that claim or, at minimum, create a genuine issue of material fact sufficient to defeat summary judgment.

DLI'S RENEWED OPP'N TO WDSMP & BVHE'S PARTIAL MOT. FOR SUMM. J.
1011421

In sum, separate from any expressive purpose, the film operated—by design—in part as an advertisement for the merchandise based on its characters, including Lots-o'-Huggin' Bear.

> **B.    Whether WDSMP and BVHE Used the Lots-o'-Huggin' Bear as a Source Identifier Presents Triable Questions of Fact, Which Forecloses Application of *Rogers* as a Matter of Law.**

Even putting aside the infringing merchandise, this Court should still not grant summary judgment to WDSMP and BVHE under *Rogers*.  As this Court has explained, "the *Rogers* test should be applied ***only*** where a mark is used ***only*** as expressive content, and should not be applied where a mark is used, ***at least in part***, to designate the source of goods."  5/1/24 Order, ECF No. 386 at 10:27–11:1 (emphasis added).  Although WDSMP and BVHE insist they used the Lots-o'-Huggin' Mark "only as expressive content" and not as a source identifier, *see* Mot. 9:10–10:2, this Court cannot conclude as much as a matter of law.

"Whether or not a mark functions as a source identifier is a question of fact[.]"  *In re GO & Assocs.*, 90 F.4th 1354, 1357 (Fed. Cir. 2024); *see also Appliance Liquidation Outlet, L.L.C. v. Axis Supply Corp.*, 105 F.4th 362, 374 (5th Cir. 2024) ("Whether [a party] actually uses [a trademark] as a source identifier is a question of fact." (internal quotation marks and citation omitted; alterations in original)); *HomeVestors of Am., Inc. v. Warner Bros. Discovery, Inc.*, 2023 WL 6880341, at *4 (D. Del. Oct. 18, 2023) ("[T]he question of whether the use of a mark is source-identifying likely contains underlying questions of fact."), *R. & R. adopted*, 2023 WL 8826729 (D. Del. Dec. 21, 2023).  Here, a reasonable jury could conclude WDSMP and BVHE used the Mark ***at least in part*** to identify *Toy*

---

Accordingly, an adverse inference against WDSMP and BVHE is appropriate. *See, e.g., Pirv v. Glock, Inc.*, 2010 WL 11579455, at *11 (D. Or. July 19, 2010) (granting motion for adverse inference instruction against party who "failed to produce responsive documentary evidence over the course of discovery").

DLI'S RENEWED OPP'N TO WDSMP & BVHE'S PARTIAL MOT. FOR SUMM. J.
1011421

1  *Story 3* as a ***Disney*** movie.

2         *1.*    *Disney admits its film characters are source identifiers.*

3         In determining whether the defendant in *Jack Daniel's* used the mark at

4  issue as a source identifier, the Supreme Court looked to how the defendant treated

5  similar marks.  *See* 599 U.S. at 160.  Thus, for example, the fact that the defendant

6  had registered similar marks as trademarks suggested the defendant used the mark

7  at issue as a source identifier.  *See id.*  So too here.

8         According to Defendant Disney Enterprises, Inc. ("DEI"), characters in

9  Disney movies, including *Toy Story*, are "***distinctive elements***" of those films that

10 are "licensed and/or merchandised."  Sep. Stmt. ¶¶ 26, 49.  Moreover, these

11 "***inherently distinctive***" characters "***serve to identify DEI and its licensees as the***

12 ***source of products bearing [those] [c]haracters.***"  *Id.* ¶¶ 26, 49.  Unsurprisingly,

13 therefore, Defendants routinely trademark the names of their inherently distinctive

14 film characters.  *See, e.g.*, Buzz Lightyear (U.S. Serial Nos. 98206716 and

15 98206614), Tinker Bell (U.S. Registration No. 6880330), Miss Piggy (3788701),

16 and Lightning McQueen (3170195).  *See* Sep. Stmt. ¶ 29.  Likewise, Pixar

17 ████████████████████████████████████████████

18 ████████████████████████████ .  *Id.* ¶ 27.  Plainly, Defendants and

19 Pixar do not consider character names to be purely expressive elements shielded

20 from liability for trademark infringement.  It is disingenuous to suggest that was

21 the case when creating and promoting the Lots-o'-Huggin' Bear character.  As in

22 *Jack Daniel's*, this historical practice gives rise to an inference that Disney's use of

23 Lots-o'-Huggin' Bear in *Toy Story 3* is not "purely expressive."

24        *2.*    *WDSMP and BVHE used Lots-o'-Huggin' Bear alongside other*

25               *distinctive characters to market* Toy Story 3 *as a Disney movie.*

26        It is even more clear from the promotion of *Toy Story 3* that WDSMP and

27 BVHE considered Lots-o'-Huggin' Bear to be an inherently distinctive source

28

1011421

1  identifier.  Both Defendants touted Lots-o'-Huggin' Bear extensively to market the

2  film, alongside well-established Disney icons such as Woody and Buzz Lightyear.

3      More specifically, in the lead-up to the film's theatrical release, WDSMP

4  rolled out a marketing campaign introducing the new Lots-o'-Huggin' Bear to

5  future audiences.  Such promotion included the faux-retro Lots-o'-Huggin' Bear

6  commercial as well as trailers, trading cards, online advertisements, and various

7  other forms of advertising. Sep. Stmt. ¶¶ 30, 43.

 

16  BVHE followed a similar approach when promoting the film's DVD release date,

17  relying on retail displays, TV advertisements, and bus station ads, each featuring

18  Lots-o'-Huggin' Bear, to advertise the DVDs.  *Id*. ¶ 31.

19      Critically, many of the posters featuring Lots-o'-Huggin' Bear did not even

20  provide the title "*Toy Story*," they simply featured Lots-o'-Huggin' Bear holding

21  the number "3."

 

14

1011421

1   *Id.* ¶ 52.  The characters themselves—Woody, Buzz Lightyear, and Lots-o'-

2   Huggin' Bear—served the necessary source identifying function instead, rendering

3   the inclusion of "Toy Story" unnecessary and showing the strength of the

4   characters as source identifiers.  Alongside Woody, Buzz Lightyear, and others,

5   WDSMP and BVHE clearly intended for consumers to associate Lots-o'-Huggin'

6   Bear with Disney's *Toy Story* franchise and to drive interest in the film using his

7   name and likeness.[5]  *See id*. ¶¶ 30–31, 33–34.

8           *3.     That Lots-o'-Huggin' Bear serves as a source identifier is clear*

9                   *from consumer perception.*

10          "In analyzing whether a proposed mark functions as a source identifier," the

11  Trademark Trial and Appeal Board "focuses on consumer perception."  *In re Vox*

12  *Populi Registry Ltd.*, 25 F.4th 1348, 1351 (Fed. Cir. 2022) (citations omitted); *see*

13

---

14  [5]  Under the Doctrine of Equivalents, WDSMP and BVHE's use of Lots-o'-

15  Huggin' Bear's likeness in advertising, particularly in combination with

16  advertising identifying the character by name, should be treated the same

17  whether or not the word mark was also included.  *See Beer Nuts, Inc. v. King*

18  *Nut Co*., 477 F.2d 326, 329 (6th Cir. 1973) (holding, where defendant's

19  packaging showing overflowing stein of beer infringed plaintiff's BEER NUTS

20  word mark, "[i]t is well settled that words and their pictorial representation are

21  treated the same in determining the likelihood of confusion between two marks.

22  … As the picture in the present case is to be given the same effect as the word

23  'beer,' we conclude that the District Court's determination [of infringement]

24  was correct"); *CPC Properties, Inc. v. Dominic, Inc.*, 2013 WL 4457338, at *6

25  (E.D. Pa. Aug. 21, 2013) (finding defendant restaurant's french fries advertised

26  with image of crab with the word FRIES infringed plaintiff's CRAB FRIES

27  word mark); *Jockey Int'l Inc. v. Butler*, 3 U.S.P.Q.2d 1607, 1987 WL 124296,

28  at *6 (T.T.A.B. 1987) (rejecting applicant's image of jockey riding horse as

    mark for clothing as confusingly similar to opposing party's registered

    JOCKEY word mark and jockey image mark because "they clearly evoke

    confusingly similar commercial impressions when used on applicant's and

    opposer's goods"); *Mobil Oil Corp. v. Pegasus Petroleum Corp*., 818 F.2d 254,

    257 (2d Cir. 1987) ("While we agree that words and their pictorial

    representations should not be equated as a matter of law, a district court may

    make such a determination as a factual matter.").

*also In Re Eagle Crest, Inc.*, 96 U.S.P.Q.2d 1227 (T.T.A.B. 2010) ("The critical inquiry in determining whether a designation functions as a mark is how the designation would be perceived by the relevant public.").

Here, contrary to WDSMP and BVHE's assertion that they used Lots-o'-Huggin' Bear "only as expressive content," Mot. 9:11–12, this Court has ***already found*** triable issues of fact as to whether Defendants' use of the "slightly modified" Mark confuses consumers about source. *See* 5/1/24 Order, ECF No. 386 at 11:18, 19:1–9 (weighing factors from *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979)). The result is the same even when the analysis is limited to only WDSMP and BVHE: the marks are similar, *see id.* at 16:23–24; consumers would exercise ordinary care, *see id.* at 17:25; the goods are related because "toys and movies are complementary," *id.* at 16:7; and all "Defendant**s**" (i.e., including WDSMP and BVHE) had prior knowledge of DLI's Mark, *id.* at 18:17–18 (emphasis added).

WDSMP and BVHE's use of Lots-o'-Huggin' Bear as a source identifier contributes to this likelihood of confusion as to source. Both the introduction of Lots-o'-Huggin' Bear in *Toy Story 3* as a means to sell toys and merchandise based on the character and the use of Lots-o'-Huggin' Bear as a key part of advertising for the theatrical and home entertainment releases create a strong correlation between the character and Disney in the minds of consumers. When kids ask for a Lots-o'-Huggin' Bear toy for Christmas, they are implicitly requesting the toy *from Toy Story 3, the Disney movie*. In this way, consumers would certainly recognize Lots-o'-Huggin' Bear as source identifying.

Because consumers would perceive Lots-o'-Huggin' Bear in this way, the Court can, and should, conclude WDSMP and BVHE used the mark "in the sense Congress prohibited"—that is, as Justice Jackson explained in *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, "in a way likely to commit the 'cardinal sin' of

DLI'S RENEWED OPP'N TO WDSMP & BVHE'S PARTIAL MOT. FOR SUMM. J.
1011421

'confus[ing] consumers about source.'"  600 U.S. 412, 430 (2023) (Jackson, J., concurring).

### C.    WDSMP and BVHE's Cited Cases Are Inapposite.

WDSMP and BVHE cite several cases in support of their argument that a character name is always expressive and thus always entitled to protection under *Rogers*.  *See* Mot. 9:21–10:4.  That premise is flawed for several reasons.

As a threshold matter, in the cases cited by WDSMP and BVHE, the courts conducted little to no analyses as to whether the defendants used the marks at issue as source identifiers.  Rather, in most instances, it was simply uncontested that the defendants' use of the character name was *not* source-identifying.  *See, e.g.*, *JTH Tax LLC v. AMC Networks Inc.*, 694 F. Supp. 3d 315, 332 (S.D.N.Y. 2023) ("Plaintiff does not dispute that Defendants' alleged use of Plaintiff's marks does not amount to use 'as a mark' or for source designation[.]"); *McGillvary v. Netflix, Inc.*, 2024 WL 3588043, at *13 (C.D. Cal. July 30, 2024) (containing a single, conclusory sentence that defendant did not use mark as source-identifier); *Down to Earth Organics, LLC v. Efron*, 2024 WL 1376532, at *4 (S.D.N.Y. Mar. 31, 2024) (same).

More critically, none of the cases WDSMP and BVHE cite involved merchandise featuring the marks at issue.  *See, e.g.*, *JTH Tax LLC*, 694 F. Supp. 3d at 333 ("Defendants are not alleged to have used the [mark] for any product they sell.") (cleaned up).[6]  Thus, unlike here, there was no question as to whether the defendants used the marks in their films or shows to advertise related merchandise.

In reply, WDSMP and BVHE will likely rely on the Ninth Circuit's recent decision in *Hara v. Netflix*, 2025 WL 2102547 (9th Cir. July 28, 2025).  In *Hara*, the plaintiff brought trademark infringement claims based on an animated show's

---

[6]    *Down to Earth Organics, LLC* references the defendant's promotion of a snack bar, but plaintiffs did not bring any cause of action related to the snack bars. 2024 WL 1376532, at *2 n.2.

use of her likeness.  The court found the allegedly infringing mark was not used to designate the source of the show, and thus *Rogers* applied, because the use of her image and likeness was only "fleeting" and "solely . . . perform[ed] some other expressive function."  *Id.* at *1.  But that case, too, is unhelpful for several reasons.

**First**, unlike here, *Hara* involved allegations of false endorsement, not trademark infringement.  The Ninth Circuit found this fact alone dispositive.  *See id.* at *7 ("*Jack Daniel's* made clear that use of an infringing mark for source-designation is what disallows application of the *Rogers* test, not other uses such as affiliation or implied endorsement.").

**Second**, unlike here, the plaintiff in *Hara* "d[id] not meaningfully dispute" that the defendant did not use plaintiff's likeness as a source identifier.  *Id.* at *6.

**Third**, in the present case, *Toy Story 3*'s use of the Lots-o'-Huggin' Bear Mark goes far beyond "fleeting."  Rather, Lots-o'-Huggin' Bear is an essential character—indeed, he is the film's main antagonist.  Mot. 9:14.  Unlike a mere background character with no dialogue like the allegedly infringing character in *Hara*, Lots-o'-Huggin' Bear was highlighted as a key part of WDSMP and BVHE's respective creative and marketing strategies.  *See* Sep. Stmt. ¶¶ 30–31.  While the character at issue in *Hara* could not be said to identify the source of the show, here WDSMP and BVHE demonstrably used Lots-o'-Huggin' Bear to identify *Toy Story 3* and Disney as the source of the film.

**Finally**, like the other cases relied upon by WDSMP and BVHE, *Hara* did not involve the advertisement and/or sale of merchandise based on the allegedly infringing use of the plaintiff's image.  *Hara*'s holding thus does not contemplate the facts at hand.

### D.    Alternatively, *Rogers* Does Not Apply to This Case of Reverse Confusion.

WDSMP and BVHE's Motion should fail for an additional, independent reason.  Applying *Rogers* "with care," as Justice Gorsuch implores, 599 U.S. at

18

1011421

1  165 (Gorsuch, J., concurring), reveals it makes no sense in a case of reverse

2  trademark confusion, like this one.

3      Under *Rogers*, once a defendant makes a threshold showing the infringement

4  was part of a solely expressive work, the burden shifts to the plaintiff to show the

5  use of the infringing mark "has no artistic relevance to the underlying work

6  whatsoever," or if it does have some artistic relevance, that it "explicitly misleads

7  as to the source or the content of the work."  875 F.2d at 999.  The "explicitly

8  misleading" standard is "a high bar that requires the use to be an 'explicit

9  indication,' 'overt claim,' or 'explicit misstatement' about the source of the work."

10 *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 462 (9th Cir. 2020) (citing

11 *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1245 (9th Cir. 2013).  That standard is

12 essentially impossible for a plaintiff to satisfy in a case of reverse confusion.

13     In a typical case of reverse confusion, "neither junior nor senior user wishes

14 to siphon off the other's goodwill." *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d

15 927, 934 (9th Cir. 2017) (cleaned up).  In other words, the junior user in a reverse

16 confusion case is ***not*** seeking to palm off the goodwill of the senior user, so there is

17 no intent to confuse.  The junior user would never make an "explicit" misstatement

18 about the source of the work and, thus, will ***always prevail*** under *Rogers* in a

19 reverse-confusion case.

20     This outcome is antithetical to the original purpose of *Rogers*.  Courts

21 adopted the *Rogers* test to strike an appropriate balance between "the public

22 interest in avoiding consumer confusion" and the "public interest in free

23 expression." *Rogers*, 875 F.2d at 999.  But the reflexive application of *Rogers* in a

24 reverse-confusion case strikes no balance at all.  Instead, it transforms a "balancing

25 test" into the ultimate "gotcha," creating an exception to trademark infringement

26 that swallows the rule.  This Court should reject WDSMP and BVHE's attempt to

27 apply that result here.

28

1

## IV.    CONCLUSION

2

For the foregoing reasons, DLI respectfully requests this Court deny

3

WDSMP and BVHE's Renewed Motion for Partial Summary Judgment.

4

5

Respectfully submitted,

6

Dated:  August 29, 2025              DTO LAW

7

8

By:   */s/ William A. Delgado*

9

William A. Delgado

10

Attorneys for Plaintiff

11

DIECE-LISA INDUSTRIES, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DLI'S RENEWED OPP'N TO WDSMP & BVHE'S PARTIAL MOT. FOR SUMM. J.

1011421

1

## <u>CERTIFICATE OF COMPLIANCE</u>

2
3
4

The undersigned, counsel of record for Plaintiff Diece-Lisa Industries, Inc., certifies that this brief contains 5,335 words, which complies with the word limit of L.R. 11-6.1.

5
6
7

Dated:  August 29, 2025                      */s/ William A. Delgado*
                                                              William A. Delgado

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DLI'S RENEWED OPP'N TO WDSMP & BVHE'S PARTIAL MOT. FOR SUMM. J.

1011421