Robert N. Klieger, State Bar No. 192962
rklieger@hueston.com
HUESTON HENNIGAN LLP
523 West 6th Street, Suite 400
Los Angeles, California 90014
Telephone:  (213) 788-4340
Facsimile:   (888) 775-0898

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DIECE-LISA INDUSTRIES, INC., | Case No. 2:20-CV-09147-TJH-JCx |
| Plaintiff, | Hon. Terry J. Hatter Jr. |
| v. | **DEFENDANTS WALT DISNEY STUDIOS MOTION PICTURES AND BUENA VISTA HOME ENTERTAINMENT, INC.'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| DISNEY ENTERPRISES, INC., et al., | |
| Defendants. | |

*[Supplemental Declaration of Robert N. Klieger, Response to Separate Statement of Genuine Disputes, and Response to Evidentiary Objections filed concurrently herewith]*

UNDER SUBMISSION

1

## <u>TABLE OF CONTENTS</u>

2                                                                                              <u>Page</u>

3   I.      INTRODUCTION ................................................................................1

4   II.     ARGUMENT .....................................................................................2

5           A.    WDSMP And BVHE Distributed *Toy Story 3*, In Which
6                 "Lots-o'-Huggin' Bear" Is Spoken Just Once As A
                  Character Name ......................................................................2
7
            B.    WDSMP And BVHE Were Not Involved In And Derived
8                 No Revenues From Sales Of Consumer Products .................4

9           C.    The Ninth Circuit's Recent Decision In *Hara* Is Controlling ...............6

10          D.    WDSMP And BVHE Did Not Use The Name "Lots-O'-
11                Huggin' Bear" As A Trademark To Identify The Source Of
                  *Toy Story 3* ..........................................................................9
12
            E.    Diece-Lisa's Efforts To Distinguish *Hara* Are In Vain ......12
13
            F.    *Toy Story 3* Is Not A "Commercial" And Is Entitled To
14                Full First Amendment Protection .........................................14

15          G.    Rogers Applies In Cases Of Both Forward And Reverse
16                Confusion...............................................................................16

17  III.    CONCLUSION................................................................................16

18

19

20

21

22

23

24

25

26

27

28

i

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Brown v. Electronic Arts, Inc.*,
   724 F.3d 1235 (9th Cir. 2013)...................................................................... 6, 12

*Caiz v. Roberts*,
   382 F. Supp. 3d 942 (C.D. Cal. Apr. 17, 2019) ........................................... 16

*City of Cincinnati v. Discovery Network, Inc.*,
   507 U.S. 410 (1993) ...................................................................................... 14

*CPC Props., Inc. v. Dominic, Inc.*,
   2013 WL 4457338 (E.D. Pa. Aug. 21, 2013)............................................... 11

*Dex Media W., Inc. v. City of Seattle*,
   696 F.3d 952 (9th Cir. 2012)......................................................................... 15

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
   547 F.3d 1095 (9th Cir. 2008)..................................................................... 6, 12

*Haas Automation, Inc. v. Steiner*,
   750 F. Supp. 3d 1107, 1118 (C.D. Cal. 2024)............................................... 9

*Hara v. Netflix, Inc.*,
   146 F.4th 872 (9th Cir. 2025)................................................................ 1, 7, 8, 12

*Harris v. Quinn*,
   573 U.S. 616 (2014) ...................................................................................... 14

*Hoffman v. Capital Cities/ABC, Inc.*,
   255 F.3d 1180 (9th Cir. 2001)....................................................................... 15

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
   73 F.3d 497 (2d Cir. 1996)............................................................................ 10

*In re Caserta*,
   46 U.S.P.Q.2d 1088 (T.T.A.B. 1998)............................................................ 10

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1

## TABLE OF AUTHORITIES (cont.)

2

Page(s)

3

*In re Scholastic Inc.*,

4

    223 U.S.P.Q. 431 (T.T.A.B. 1984)........................................................................... 10

5

*Jack Daniel's Props., Inc. v. VIP Products LLC*,

6

    599 U.S. 140 (2023) ..........................................................................................*passim*

7

*Joseph Burstyn, Inc. v. Wilson*,

8

    343 U.S. 495 (1952) ...................................................................................................... 14

9

*JTH Tax LLC v. AMC Networks Inc.*,

10

    694 F. Supp. 3d 315 (S.D.N.Y. 2023) .............................................................. 7, 12

11

*Mattel Inc. v. MCA Records, Inc.*,

12

    296 F.3d 894 (9th Cir. 2002)........................................................................... 14, 16

13

*Moose Creek, Inc. v. Abercrombie & Fitch Co.*,

14

    331 F. Supp. 2d 1214 (C.D. Cal. 2004)................................................................. 11

15

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,

16

    487 U.S. 781 (1988) ...................................................................................................... 15

17

*Rogers v. Grimaldi*,

18

    875 F.2d 994 (2d Cir. 1989)...........................................................................*passim*

19

*Twentieth Century Fox Television v. Empire Distrib., Inc.*,

20

    875 F.3d 1192 (9th Cir. 2017)........................................................................... 6, 12

21

**Statutes**

22

15 U.S.C. § 1127 ................................................................................................................... 2

23

**Other**

24

Trademark Manual of Examining Procedure (2025) .................................................. 10

25

26

27

28

## I.    <u>INTRODUCTION</u>

This Court originally granted summary judgment for all defendants under *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), because Plaintiff Diece-Lisa Industries, Inc. ("Diece-Lisa") could not establish that defendants' use of the "Lots-o'-Huggin' Bear" name was explicitly misleading as to the source or content of *Toy Story 3* or any toys, games, apparel, or other consumer products based on the movie. Dkt. 357 at 4-5. The Ninth Circuit affirmed, but the Supreme Court then remanded for further consideration in light of its decision in *Jack Daniel's Props., Inc. v. VIP Products LLC*, 599 U.S. 140 (2023).

At the time defendants Walt Disney Studios Motion Pictures ("WDSMP") and Buena Vista Home Entertainment, Inc. ("BVHE") filed the instant motion in August 2024, the Ninth Circuit had not yet considered how *Jack Daniel's* impacts the application of *Rogers* to the distribution of quintessential expressive works such as movies and television shows. In its original opposition, Diece-Lisa advanced a sweeping interpretation of *Jack Daniel's* and also argued that, if afforded the opportunity to take additional discovery, it would show that WDSMP and BVHE were themselves involved in and derived revenues from sales of consumer products.

There have been two material developments since the time of Diece-Lisa's original opposition. First, the Court afforded Diece-Lisa the opportunity to take additional discovery regarding whether WDSMP and BVHE were involved in or derived revenues from sales of consumer products. Diece-Lisa took that discovery, but it failed to adduce evidence that WDSMP or BVHE had any involvement in consumer products or derived revenues from anything other than the theatrical and home video distribution of *Toy Story 3*.

Second, and more importantly, the Ninth Circuit's recent and controlling decision in *Hara v. Netflix, Inc.*, 146 F.4th 872 (9th Cir. 2025), provides clear rules regarding the application of *Rogers* to expressive works in the wake of *Jack Daniel's*. Specifically, the Ninth Circuit reaffirmed existing precedent applying

*Rogers* to movies and television shows, including their marketing and promotion, except where a plaintiff proves that the defendant used the challenged name, mark, or likeness *as a trademark*, to identify the source of the expressive work at issue. Diece-Lisa has not made, and cannot make, that showing here.  Indeed, no reasonable jury could find that the name of a secondary character introduced for the very first time in *Toy Story 3*, and spoken just once 22 minutes into the movie's 103-minute runtime, was used as a trademark to identify the source of the film.  Rather, the source of *Toy Story 3*—Walt Disney Pictures and Pixar Animation Studios—is identified in the very first minute of the movie, at the outset of trailers, and on posters and other print materials promoting the film.

In short, Diece-Lisa cannot make the showing that the Ninth Circuit's *Hara* decision requires to exempt its claims against WDSMP and BVHE from *Rogers*.  As this Court has already determined, Diece-Lisa's claims fail as a matter of law under *Rogers*, Dkt. 357 at 4-6, and the Court should therefore grant the instant motion.

## II.    ARGUMENT

### A.    WDSMP And BVHE Distributed *Toy Story 3*, In Which "Lots-o'-Huggin' Bear" Is Spoken Just Once As A Character Name

Diece-Lisa holds a trademark registration for the word mark LOTS OF HUGS as used in connection with puppets.  Dkt. 325-2 (USPTO Reg. No. 3,361,849). Diece-Lisa's registration does not cover the visual depiction of a bear or any of the other puppet animals on which Diece-Lisa used its word mark.  *Id.*  Trademark infringement can therefore arise only if a defendant makes unauthorized use of *the words* LOTS OF HUGS or a colorable imitation thereof in a manner that is likely to cause consumer confusion.  15 U.S.C. § 1127.

*Toy Story 3* is the third installment in the *Toy Story* franchise.  *See* Dkt. 332-23 (*Toy Story 3* DVD).  The movie introduced 14 new secondary characters, including a unicorn named "Buttercup," a dinosaur named "Trixie," an octopus named "Stretch," a porcupine named "Mr. Pricklepants," a worm named

"Bookworm," and a teddy bear named "Lots-o'-Huggin' Bear." *Id.*; Dkt. 435-20; *see* Supplemental Declaration of Robert N. Klieger ("Supp. Klieger Decl."), Ex. A (Lourie Depo. Tr. at 58:3-8 (identifying "Lots-o'-Huggin' Bear" as "a sidekick and secondary character")); *id.*, Ex. C (Elias Depo. Tr. at 19:24-20:1 (identifying "Lots-o'-Huggin' Bear" as "a secondary or tertiary character")).  Diece-Lisa alleges that the name "Lots-o'-Huggin' Bear" is confusingly similar to its LOTS OF HUGS word mark and seeks to hold 14 subsidiaries of The Walt Disney Company liable for their use of the name "Lots-o'-Huggin' Bear" in *Toy Story 3*, in related expressive works (*e.g.*, music CDs, books, and other publications), and on toys, games, apparel, and other consumer products based on the movie.  *See* Dkt. 325 (5th Am. Compl.).

The instant motion is brought by just two of the 14 defendants, WDSMP and BVHE.  Diece-Lisa seeks to hold WDSMP liable based upon use of the "Lots-o'-Huggin' Bear" name "in the *Toy Story 3* movie, based on theater receipts received therefrom," and to hold BVHE liable for use of the "Lots-o'-Huggin' Bear" name "in the *Toy Story 3* DVDs and Blu-Rays, based upon sales thereof."  Dkt. 325 at 26. The "Lots-o'-Huggin' Bear" name is spoken just once, around the 22-minute mark, in the movie's entire 103-minute runtime.  Dkt. 398-1 (SUF ¶ 3).  Based on that single, fleeting use of the name in *Toy Story 3*, Diece-Lisa seeks to disgorge tens of millions of dollars that WDSMP and BVHE earned from their theatrical and home video distribution of the movie.

Diece-Lisa's claims against the other 12 defendants are not based on distribution of the *Toy Story 3* movie, but are based instead on their own use of the "Lots-o'-Huggin' Bear" name on *other* products, principally toys, games, apparel, and similar merchandise.  The uses of the "Lots-o'-Huggin' Bear" name by those other defendants are not at issue on this motion.  Rather, this motion concerns only the single, fleeting use of the character's name in *Toy Story 3* as distributed by WDSMP and BVHE.

## B.    WDSMP And BVHE Were Not Involved In And Derived No Revenues From Sales Of Consumer Products

WDSMP and BVHE filed this motion on the grounds that their use of the allegedly infringing name was limited to distribution of a movie in which "Lots-o'-Huggin' Bear" was spoken just once as the name of a character.  They did not use the character's name to identify the source of *Toy Story 3* and therefore could not be held liable for infringement under *Rogers*.  *See* Dkt. 398 at 9-12.  WDSMP and BVHE further presented evidence that they had no involvement in and derived no revenues from toys, games, apparel, or other consumer products based on *Toy Story 3*.  Dkt. 398-2 (Kalavsky Decl. ¶¶ 3-4); Dkt. 398-3 (Lourie Decl ¶¶ 3-4).

In its initial opposition to the motion, Diece-Lisa argued that the Court should defer its ruling under Rule 56(d) to allow Diece-Lisa to take additional discovery that, according to Diece-Lisa's counsel, would show that WDSMP and BVHE *were* involved in and *did* receive revenues from sales of consumer products featuring the "Lots-o'-Huggin' Bear" character.  Dkt. 400 at 15-18; Dkt. 400-3 (Delgado Decl. ¶¶ 22, 24-25).  Specifically, Diece-Lisa sought leave to "take the depositions of Matthew Kalavsky and Jennifer Lourie regarding the assertions in their declarations" and to take other discovery that Diece-Lisa believed would "develop facts demonstrating that WDSMP and BVHE received revenue attributable to sales of other products featuring Lots-o'-Huggin' Bear."  Dkt. 400-3 (Delgado Decl. ¶¶ 17, 22, 24).

Following the Court's granting of Diece-Lisa's Rule 56(d) request, Diece-Lisa:

- propounded additional requests for production, requests for admission, and interrogatories to WDSMP and BVHE;
- deposed WDSMP's Matthew Kalavsky and BVHE's Jennifer Lourie both individually and as corporate representatives;

- deposed a former BVHE executive, Lori Elias, regarding the marketing and distribution of *Toy Story 3* on DVD and Blu-ray; and

- propounded additional requests for production, requests for admissions, and interrogatories to non-moving defendants Disney Enterprises, Inc., Disney Consumer Products, Inc., Disney Store USA, LLC, and Disney Shopping, Inc.

Supp. Klieger Decl. ¶ 2.

Diece-Lisa did not use the depositions of Kalavsky or Lourie for the asserted purpose of questioning them "regarding the assertions in their declarations." Dkt. 400-3 (Delgado Decl. ¶ 17). While Diece-Lisa's counsel did ask Kalavsky to authenticate his declaration and confirm his position at WDSMP, counsel did not ask Kalavsky anything about the contents of his declaration. *Id.*, Ex. B (Kalavsky Depo. Tr. 16:18-18:10). Diece-Lisa's counsel similarly asked Lourie to authenticate her declaration and confirm her position at BVHE. *Id.*, Ex. A (Lourie Depo. Tr. 24:22-26:4). While Diece-Lisa's counsel stated that he "[m]ay come back to [the declaration] in just a moment," he never did. *Id.* (Lourie Depo. Tr. 26:3).

Nor did Diece-Lisa elicit any testimony from Kalavsky or Lourie to establish that WDSMP or BVHE had any involvement in or derived any revenues from sales of consumer products. To the contrary, Kalavsky and Lourie confirmed that WDSMP and BVHE derived revenues solely from the theatrical and home video distribution of *Toy Story 3* and had no involvement in merchandising based on the movie. *Id.*, Ex. B (Kalavsky Depo. Tr. 24:21-23, 25:6-9); *id.*, Ex. A (Lourie Depo. Tr. 55:18-20, 61:2-5, 69:24-70:12).

Diece-Lisa's written and document discovery, and its deposition of Elias, similarly yielded no evidence whatsoever that WDSMP or BVHE had any involvement in or derived any revenues from sales of toys, games, apparel, or other consumer products based on the "Lots-o'-Huggin' Bear" character, or even related to *Toy Story 3* more generally.

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

### C. The Ninth Circuit's Recent Decision In *Hara* Is Controlling

At the time this motion was filed in August 2024, the Ninth Circuit had not yet addressed the application of *Rogers* to quintessential expressive works such as movies and television shows in the wake of the Supreme Court's ruling in *Jack Daniel's*. That is no longer the case. Just six weeks ago, the Ninth Circuit in *Hara* explained exactly how *Rogers* applies to expressive works after *Jack Daniel's* and, in so doing, reaffirmed the Ninth Circuit precedents upon which this Court had relied in granting summary judgment in the first instance.

The Ninth Circuit has long embraced *Rogers* in the context of Lanham Act claims based on the use of a name, mark, or likeness in the body of an expressive work. *E.g.*, *Twentieth Century Fox Television v. Empire Distrib., Inc.*, 875 F.3d 1192, 1196 (9th Cir. 2017) (fictional "Empire Enterprises" record label in *Empire* television show); *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008) ("Pig Pen" virtual strip club in *Grand Theft Auto: San Andreas* video game); *Brown v. Electronic Arts, Inc.*, 724 F.3d 1235, 1241 (9th Cir. 2013) (athlete's likeness in *Madden NFL* video game). The Ninth Circuit also applied *Rogers* to the use of a name, mark, or likeness to market or promote an expressive work. In *Empire Distrib.*, for instance, the Ninth Circuit held that sales of shirts, champagne glasses, and other products to promote a television show containing the allegedly infringing mark were properly analyzed under *Rogers*; "[a]lthough it is true that these promotional efforts technically fall outside the title or body of an expressive work, it requires only a minor logical extension of the reasoning of *Rogers* to hold that works protected under its test may be advertised and marketed by name, and we so hold." *Empire Distrib.*, 875 F.3d at 1196-97. For decades, *Rogers* and its progeny played a significant role in ensuring breathing space for artistic expression—and nowhere more so than in film and television.

*Jack Daniel's* did not involve a movie or television show. Instead, *Jack Daniel's* involved a chewable dog toy manufactured by VIP Products made to

mimic a bottle of Jack Daniel's whisky and sold under the "Bad Spaniel's" trademark. *Jack Daniel's*, 599 U.S. at 144. The question before the Supreme Court was whether *Rogers* properly applies to a dog toy parodying the famous Jack Daniel's trademark and trade dress. The Supreme Court issued a "narrow" ruling that *Rogers* does not apply "when the accused infringer has used a trademark to designate the source of its own goods—in other words, has used a trademark as a trademark." *Id.* at 145, 163. *Jack Daniel's* recognizes that when a party uses a mark as a source identifier, such as on a commercial product, that places the use squarely within the domain typically covered by trademark law, and far afield from the expressive works to which *Rogers* has traditionally been applied.

After *Jack Daniel's* was decided, district courts in this and other circuits had little trouble recognizing that the use of a name in the body of an expressive work is not the use of a trademark as a source identifier. In *JTH Tax LLC v. AMC Networks Inc.*, 694 F. Supp. 3d 315 (S.D.N.Y. 2023), for instance, a tax preparation service operating under the name "Liberty Tax Service" sued the producers of the television show *Better Call Saul* over an episode that depicted a fictional tax preparation service called "Sweet Liberty Tax Services." *Id.* at 323-24. In dismissing the claim under *Rogers*, the Southern District of New York explained that the defendants had used the name "in furtherance of the Show's plot," and not "to identify the source of *Better Call Saul*." *Id.* at 332-33. The court held *Rogers* applied notwithstanding the fact that the defendants had used the name not only in an episode of the series, but also in a trailer for the show and in a social media post designed to look like an advertisement for "Sweet Liberty Tax Services." *Id.* at 330 n.2.

*Hara* is the first case in which the Ninth Circuit addressed *Jack Daniel's* in the context of a quintessential expressive work. The plaintiff in that case, Lance Hara, has long performed as a drag queen in West Hollywood. *Hara*, 146 F.4th at 874. In 2021, Netflix released a cartoon series called *Q-Force* "about a group of underappreciated queer spies who must save the planet from various dangers." *Id.*

Hara claimed that an animated version of her likeness appeared in *Q-Force* and in materials promoting the show, and that her depiction in the show and marketing materials wrongly led viewers to believe that she was affiliated with *Q-Force*. *Id.* at 874-76. Hara sued under the Lanham Act, and the district court applied *Rogers* to dismiss Hara's claims. *Id.* at 876. Hara appealed, arguing that *Jack Daniel's* barred application of *Rogers* to her Lanham Act claims.

The Ninth Circuit affirmed the district court's dismissal under *Rogers*. The Ninth Circuit explained that the use of a name or likeness in a movie or television show is protected by the First Amendment, and *Rogers* therefore applies, unless the plaintiff proves that the defendant used the name or likeness *as a trademark*, to identify the source of the expressive work. *Id.* at 881-82. Hara had not alleged, and could not reasonably allege, that the use of her likeness in an episode of *Q-Force* and related marketing materials served to designate the source of the show. *Id.* at 881-83. The Ninth Circuit did not discount the possibility that someone watching *Q-Force* might believe that Hara was somehow affiliated with or even endorsed the show. *Id.* at 881. However, that was not enough to escape *Rogers*. "*Jack Daniel's* made clear that use of an infringing mark *for source-identification* is what disallows application of the *Rogers* test, not other uses such as affiliation or implied endorsement." *Id.* at 881 (emphasis added). Based upon its review of the show, the Ninth Circuit had no difficulty concluding that Hara's likeness had not been used as a source identifier. *Id.* at 882.

Importantly, *Hara* also reaffirmed pre-*Jack Daniel's* case law holding that *Rogers* applies to the use of a name or likeness not only in a movie or television show, but also in advertisements and promotions for the movie or television show, even where those promotional activities themselves generate revenue. *Id.*

### D. WDSMP And BVHE Did Not Use The Name "Lots-O'-Huggin' Bear" As A Trademark To Identify The Source Of *Toy Story 3*

In view of *Hara*, the instant motion turns on the answer to a single question: Has Diece-Lisa proffered evidence from which a reasonable jury could find that WDSMP and BVHE used the name "Lots-o'-Huggin' Bear" as a trademark to identify the source of *Toy Story 3*?  It plainly has not.

In the first instance, during the more than a decade this case had been pending prior to the Supreme Court's decision in *Jack Daniel's*, Diece-Lisa never once alleged that WDSMP or BVHE used the name "Lots-o'-Huggin' Bear" as a trademark to identify the source of *Toy Story 3*.  Instead, as recently as the operative Fifth Amended Complaint, Diece-Lisa alleged only that WDSMP and BVHE used "Lots-o'-Huggin' Bear" as "the name of a … character, a bear, in *Toy Story 3*." Dkt. 325 ¶ 86.  Nowhere in that or any other pleading did Diece-Lisa allege that WDSMP or BVHE used the name as a trademark to identify the source of the movie.

Moreover, it is undisputed that the "Lots-o'-Huggin' Bear" name is spoken just once, around the 22-minute mark, in *Toy Story 3*'s entire 103-minute runtime. Dkt. 398-1 (SUF ¶ 3).  Diece-Lisa has not adduced *any* evidence that moviegoers perceived the name of that character, who was introduced for the very first time in *Toy Story 3* and was previously unknown to audiences, as identifying the source of the movie.  Rather, the source of *Toy Story 3* is explicitly identified in the very first minute of the movie as Walt Disney Pictures and Pixar Animation Studios.  Dkt. 332-23 (*Toy Story 3* DVD).  It is wholly implausible that audiences would perceive the name of secondary character, spoken for the first and only time more than 20 minutes into *Toy Story 3*, to identify the source of the movie.  *See Haas Automation, Inc. v. Steiner*, 750 F. Supp. 3d 1107, 1118 (C.D. Cal. 2024) (granting motion to dismiss under *Rogers* where marks plainly were "not used to tell the consumer who published the book or the source of the book").

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Diece-Lisa does not identify a single case, from any jurisdiction, in which the name of a character in a movie has been found to identify the source of the movie. To the contrary, both case law and the USPTO's own procedures for registering marks recognize that "[m]arks that merely identify a character in a creative work" do not function as trademarks. Trademark Manual of Examining Procedure (2025) § 1202.10; *see In re Caserta*, 46 U.S.P.Q.2d 1088, 1090-91 (T.T.A.B. 1998) (holding character name did not function as a mark despite appearing on the cover and every page of a children's book); *In re Scholastic Inc.*, 223 U.S.P.Q. 431, 431 (T.T.A.B. 1984) (holding that "The Littles" used in the title of children's books did not function as a mark but instead identified the main characters in the books).

The Second Circuit's decision in *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497 (2d Cir. 1996), is illustrative. The defendant in that case named a wild boar character in its *Muppet Treasure Island* movie "Spa'am," which Hormel alleged diluted its trademark in the luncheon meat SPAM. *Id.* at 500-01. In rejecting that argument, the Second Circuit recognized that "Henson is not using the name 'Spa'am' as a product brand name"; "[r]ather, Spa'am is a character in products branded with Henson's own trademark 'Muppet Treasure Island.'" *Id.* at 506. In the instant case, as in *Hormel*, "Lots-o'-Huggin' Bear" is used not to identify the source of *Toy Story 3*, but instead as the name of a character in the movie.

Diece-Lisa identifies several famous animated characters, including Tinker Bell and Miss Piggy, that have been registered as trademarks, and argues that character names must therefore serve as source-identifiers. Dkt. 436 at 13; Dkt. 436-3. In every instance, however, the characters identified by Diece-Lisa were registered as trademarks *for consumer products*, such as bath linens, blankets, dolls, t-shirts, and sandals. *Id.* WDSMP and BVHE do not sell consumer products. Dkt. 398-2 ¶ 3; Dkt. 398-3 ¶ 3. Diece-Lisa has not identified a single instance in which a character name has been registered as a trademark for a movie in which the

character appears.  Nor has Diece-Lisa identified any U.S. trademark registrations for the name "Lots-o'-Huggin' Bear" for *any* goods or services.  There are none.

Diece-Lisa next argues that WDSMP and BVHE's purported use of the "Lots-o'-Huggin' Bear" name to identify the source of *Toy Story 3* may be inferred from the fact that Pixar Animation Studios, which produced *Toy Story 3*, obtained authorizations from Mattel, Hasbro, and other third-party toy companies to have their toys, such as Barbie, appear as characters in the movie.  Dkt. 436 at 13; Dkt. 438-4.  Far from supporting Diece-Lisa's argument, this actually undercuts its contention that character names in *Toy Story 3* were used to identify the source of the movie.  None of Mattel, Hasbro, or those other toy companies were the source of *Toy Story 3*, and their toys—like the Lots-o'-Huggin' Bear character—were instead part of the expressive fabric of the movie.

Finally, Diece-Lisa argues that WDSMP and BVHE used the "Lots-o'-Huggin' Bear" name not only in *Toy Story 3*, but also in numerous trailers and promotions for the movie.  Dkt. 436 at 18.  In the first instance, that is untrue.  Diece-Lisa does not identify even one trailer, banner, poster, or in-store retail display that used the name "Lots-o'-Huggin' Bear."  Diece-Lisa instead identifies various trailers and marketing materials that included an image of the movie's pink bear antagonist, often alongside other characters from the movie, *without any use of his allegedly infringing name*.  Dkt. 435-16 (theater banners); Dkt. 435-17 (bus shelter poster); Dkt. 435-19 (online character rollout); Dkt. 435-21 (trailer); Dkt. 435-22 (trailer); Dkt. 435-23 (trailer); Dkt. 435-26 (in-store retail displays); Dkt.

435-28 (television advertisement); Dkt. 435-29 (television advertisement).[1]  Indeed, the *only* promotional media identified by Diece-Lisa that actually used the "Lots-o'-Huggin' Bear" name is a fake commercial that Pixar uploaded to YouTube to promote *Toy Story 3*.  Dkt. 435-15 (fake commercial); Supp. Klieger Decl., Ex. B (Kalavsky Depo. Tr. 39:17-40:6).  That fake commercial is no different than the fake advertisement for "Sweet Liberty Tax Services" that the defendants in *JTH Tax* created to promote *Better Call Saul* and, like that fake advertisement, falls squarely within *Rogers*.  *See JTH Tax*, 694 F. Supp. 3d at 330 n.2; *Hara*, 146 F.4th at 882 (trailers and other promotional efforts covered by *Rogers*).

### E.   Diece-Lisa's Efforts To Distinguish *Hara* Are In Vain

Diece-Lisa recognizes both that *Hara* controls the application of *Rogers* to movies and television shows after *Jack Daniel's* and that it cannot make the requisite showing under *Hara*—namely, that WDSMP and BVHE used the "Lots-o'-Huggin' Bear" name *as a trademark* to identify the source of *Toy Story 3*.  Diece-Lisa therefore makes four arguments in an effort to distinguish *Hara*.  None has any merit.

*First*, Diece-Lisa argues that "*Hara* involved allegations of false endorsement, not trademark infringement."  Dkt. 435 at 18.  That is true, but so did *Rogers* itself.  The Ninth Circuit, like other circuits, applies *Rogers* to Lanham Act claims regardless of whether the specific claim is for trademark infringement, trade dress infringement, or false endorsement.  *See, e.g.*, *Empire Distrib.*, 875 F.3d at

---

[1] Diece-Lisa attempts to skirt this issue by invoking "the doctrine of equivalents," under which "a picture mark that literally portrays the entirety of a word mark" may be found to infringe the word mark.  *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214, 1228-29 (C.D. Cal. 2004); *see CPC Props., Inc. v. Dominic, Inc.*, 2013 WL 4457338, at *6 (E.D. Pa. Aug. 21, 2013) (image of a crab with the word FRIES infringed CRAB FRIES mark).  Diece-Lisa's word mark, however, is LOTS OF HUGS, and a pink bear is not an unmistakable visual representation of those words.  The doctrine of equivalents is entirely inapposite.

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1196-97 (trademark infringement); *E.S.S. Entm't*, 547 F.3d at 1098 (trade dress); *Brown*, 724 F.3d at 1239 (false endorsement). It is the use of a name or likeness in the title or body of an expressive work, and not the specific type of Lanham Act claim asserted, that triggers *Rogers*.

*Second*, Diece-Lisa asserts that the plaintiff in *Hara* did "not meaningfully dispute" that the defendants had not used Hara's likeness as a source identifier. Dkt. 435 at 18. Whether or not *Rogers* applies, however, turns not on how vociferously a plaintiff argues that a name or mark is being used as a source identifier, but instead on whether the plaintiff adduces *evidence* of a trademark use. Diece-Lisa has not proffered any evidence from which a jury could find that WDSMP and BVHE used the "Lots-o'-Huggin' Bear" character name as a trademark to identify the source of *Toy Story 3*.

*Third*, Diece-Lisa asserts that "*Toy Story* 3's use of the Lots-o'-Huggin' Bear Mark goes far beyond 'fleeting.'" *Id.* Diece-Lisa is mistaken. It is undisputed that the name "Lots-o'-Huggin' Bear" is spoken just once in *Toy Story 3*'s entire 103-minute runtime, thus making its use even more fleeting than the plaintiff's image in *Hara*. Dkt. 398-1 (SUF ¶ 3). While the pink bear character appears throughout the movie, it is only the *name* of the character, and not its visual depiction, that allegedly infringes Diece-Lisa's LOTS OF HUGS word mark.

Finally, Diece-Lisa observes that the defendants in *Hara* marketed and distributed only the *Q-Force* television show, and not any merchandise using the plaintiff's likeness. Dkt. No. 435 at 18. While certain of the defendants in the instant case did sell toys or other consumer products marked with the "Lots-o'-Huggin' Bear" name, those defendants are not parties to the instant motion. This motion is instead brought solely by WDSMP and BVHE, and they, like the defendants in *Hara*, marketed and distributed nothing beyond the expressive work itself.

1    In short, Diece-Lisa's attempts to distinguish *Hara* are in vain, and they are

2    no substitute for actual evidence that WDSMP and BVHE used the "Lots-o'-

3    Huggin' Bear" name *as a trademark* to identify the source of *Toy Story 3*.  Even

4    after an additional round of discovery, there is no such evidence, and *Rogers* is

5    therefore fatal to Diece-Lisa's claims.

6    **F.    *Toy Story 3* Is Not A "Commercial" And Is Entitled To Full First**

7    **Amendment Protection**

8    Unable to establish that WDSMP and BVHE used the name "Lots-o'-Huggin'

9    Bear" as a trademark to identify the source of *Toy Story 3*, Diece-Lisa attempts to

10   circumvent *Rogers* altogether by arguing that the ACADEMY AWARD® winning

11   *Toy Story 3* was actually a commercial—specifically, "an advertisement for toys and

12   characters"—and therefore is not entitled to the full protections of the First

13   Amendment.  Dkt. 435 at 8-12.  This argument is foreclosed by the Supreme Court's

14   First Amendment jurisprudence.  The fact that WDSMP and BVHE distributed *Toy*

15   *Story 3* for a profit, or that the movie may have contributed to sales of toys by the

16   consumer product defendants, does not transform the movie itself into commercial

17   speech or otherwise deprive it of full First Amendment protection.

18   The Supreme Court held nearly 75 years ago that motion pictures, like other

19   quintessential expressive works, are protected expression notwithstanding the fact

20   that they are distributed for a profit.  *See Joseph Burstyn, Inc. v. Wilson*, 343 U.S.

21   495, 502 (1952).  In the decades since, the Supreme Court has repeatedly reaffirmed

22   that motion pictures, theatrical productions, television and radio programming, live

23   entertainment, music, books, paintings, and other works of art or commentary are

24   protected forms of speech, regardless of any profit motive.  *E.g.*, *City of Cincinnati*

25   *v. Discovery Network, Inc.*, 507 U.S. 410, 420-21 (1993).  Nor does the fact that a

26   motion picture, television program, or other quintessential expressive work may

27   help drive sales of consumer products lessen its First Amendment protection.

28   Commercial speech is speech that *does nothing more* than propose a commercial

14

1    transaction.  *See Harris v. Quinn*, 573 U.S. 616, 648 (2014).  "If speech is not

2    'purely commercial'—that is, if it does more than propose a commercial

3    transaction—then it is entitled to full First Amendment protection."  *Mattel Inc. v.*

4    *MCA Records, Inc.*, 296 F.3d 894, 906 (9th Cir. 2002).  Even the inclusion of

5    explicitly commercial material in an expressive work has no impact on its protected

6    status.  *See Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 963 (9th Cir. 2012).

7        The Ninth Circuit's decision in *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d

8    1180 (9th Cir. 2001), is particularly instructive.  In that case, a magazine published

9    an article featuring digitally recreated images from certain films that were modified

10   so that the actors appeared to be wearing designers' spring fashions.  *Id.* at 1183.

11   For example, a still of Dustin Hoffman from the movie *Tootsie* was altered to make

12   it look like he was wearing a Richard Tyler evening gown and Ralph Lauren heels.

13   *Id.*  The trial court ruled in favor of Hoffman on his Lanham Act and related claims,

14   rejecting the magazine's defense that its use of the photograph was protected by the

15   First Amendment.  *Id.*

16       The Ninth Circuit reversed the trial court's decision, holding that the First

17   Amendment barred Hoffman's claims.  In so ruling, the Ninth Circuit recognized

18   that the magazine and article contained many "commercial aspects."  *Id.* at 1185.

19   For example, the Hoffman image "was identified as wearing Ralph Lauren shoes"

20   and a Ralph Lauren advertisement appeared elsewhere in the magazine.  *Id.*  The

21   magazine also included a "Shopper's Guide," "which provided stores and prices for

22   the shoes and gown" featured in the Hoffman image.  *Id.*  However, the Ninth

23   Circuit held that even overtly commercial aspects like those did not make the work

24   "commercial speech" for purposes of the First Amendment.  *Id.*  Rather, the article

25   contained various "expressive elements," including "fashion photography, humor,

26   and visual and verbal editorial content," that were "inextricably intertwined" with

27   the commercial aspects and therefore rendered it "fully protected" under the First

28   Amendment.  *Id.*; *see Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781,

15

796 (1988) (speech is fully protected under the First Amendment where expressive and commercial aspects "are inextricably intertwined").

*Hoffman* and its progeny foreclose Diece-Lisa's commercial speech argument here. *Toy Story 3* plainly does "more than propose a commercial transaction," and it unquestionably "includes protected expression." *MCA Records*, 296 F.3d at 906. Indeed, were Diece-Lisa's argument correct, most every motion picture and television program would lose First Amendment protection as a result of sales of posters, t-shirts, toys, and other consumer products based thereon. That is not the law, and *Toy Story 3* is "entitled to full First Amendment protection" for purposes of *Rogers*. *Id.*

### G.    *Rogers* Applies In Cases Of Both Forward And Reverse Confusion

In a last-ditch effort to forestall summary judgment, Diece-Lisa argues that the Court should decline to apply *Rogers* because Diece-Lisa alleges reverse confusion. Dkt. 435 at 18-19. However, as this Court has previously held, "[t]he Ninth Circuit did not condition its adoption of *Rogers* on the type of trademark action," and "other district courts, including one in the Central District of California have held that *Rogers* applies without modification in reverse confusion cases." Dkt. 357 at 5 (citing *Caiz v. Roberts*, 382 F. Supp. 3d 942 (C.D. Cal. Apr. 17, 2019)). Moreover, as before, "Diece-Lisa [has] failed to cite any precedent … that would allow this Court to deviate from *Rogers*." *Id.* The Supreme Court's holding in *Jack Daniel's* did nothing to limit *Rogers* to cases of forward confusion, and there is no basis to exempt this case from *Rogers*.

## III.    <u>CONCLUSION</u>

Diece-Lisa has not proffered any evidence capable of creating a triable issue as to whether WDSMP and BVHE used the "Lots-o'-Huggin' Bear" name *as a trademark* to identify the source of *Toy Story 3*. They plainly did not, and no reasonable jury could conclude otherwise. If the mere assertion of trademark use was enough to require a trial, movie and television studios would no longer be able

16

1  to predict *Rogers*' application to their works.  In turn, the lack of predictability

2  would chill important—and constitutionally protected—creative speech.

3        WDSMP and BVHE did not engage in the kind of trademark use

4  contemplated by *Jack Daniel's*, and the Ninth Circuit's *Rogers* jurisprudence

5  therefore requires dismissal of Diece-Lisa's claims against them.  WDSMP and

6  BVHE respectfully request that the Court grant their motion for partial summary

7  judgment.

8  Dated:  September 12, 2025              HUESTON HENNIGAN LLP

9

10                                          By:  */s/ Robert N. Klieger*

11                                                Robert N. Klieger
                                                  Attorneys for Defendants
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **L.R. 11-6.2 CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants, certifies that this brief contains 5,389 words, which complies with the word limit of L.R.11-6.1.

Dated:  September 12, 2025          HUESTON HENNIGAN LLP


                                                        By:  */s/ Robert N. Klieger*
                                                              Robert N. Klieger
                                                              Attorneys for Defendants